[No. 40593-8-II.   Division Two.   August 8, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. JAYCEE FULLER, *Appellant*.

*Kathryn A. Russell Selk* (of *Russell Selk Law Office*), for appellant.

*Mark E. Lindquist, Prosecuting Attorney,* and *Brian N. Wasankari, Deputy,* for respondent.

¶1  VAN DEREN, J. — Jaycee Fuller appeals his convictions for first degree felony murder and first degree premeditated murder, arguing that (1) the State committed prejudicial misconduct by commenting on Fuller's partial silence, appealing to the jury's emotions, and minimizing the State's burden of proof; (2) the trial court abused its discretion in admitting propensity evidence and that such admission was not harmless; and (3) the trial court subjected Fuller to double jeopardy when it merged his two first degree murder convictions instead of dismissing one of them. We reject Fuller's double jeopardy claim. But we hold that the State committed prejudicial prosecutorial misconduct by using Fuller's partial silence as substantive evidence of his guilt,

the trial court abused its discretion in admitting propensity evidence, and its admission of the propensity evidence was not harmless. Accordingly, we are compelled to reverse and remand for a new trial.[1]

## FACTS

### I. THE CRIME AND INVESTIGATION

¶2  In the early morning hours of March 8, 2009, 22-year-old Mohamud Ahmed, a driver for King Cab Company, was stabbed to death in his cab. Tacoma police officers discovered Ahmed's cab idling near the entrance to a parking lot on an isolated stretch of road in south Tacoma. Ahmed's body, surrounded by a significant amount of blood, was lying facedown on the ground on the driver's side of the cab, with his left arm tangled in the driver's seat belt.

¶3  Ahmed's killer had inflicted knife wounds to Ahmed's neck, hand, and chest. Based on her autopsy findings, a forensic pathologist concluded that the injuries to Ahmed's right hand were consistent with defensive wounds and that the killer stabbed Ahmed's chest after slicing his neck. She estimated that Ahmed went into shock within three minutes and died within five minutes of his neck wound.

¶4  King Cab's global positioning system (GPS) confirmed that Ahmed picked up his last passenger at Masa Restaurant in Tacoma and the cab's fare meter showed Ahmed picked up that passenger at 3:05 AM.[2] Police obtained surveillance video footage from Masa and neighboring businesses showing a man standing on the sidewalk in front of Masa around 1:40 AM. The man in the surveillance footage is wearing dark clothing and a dark, form-fitting

---

[1] Because we reverse and remand for a new trial, we do not address Fuller's arguments on cumulative error or ineffective assistance of counsel based on trial counsel's failure to object to the trial court's special verdict jury instruction.

[2] On March 8, 2009, daylight saving time began at 2:00 AM. The video recorded the man on the sidewalk at 1:40 AM but 25 minutes later it would have been 3:05 AM.

hat with a white stripe around the bottom. Approximately 25 minutes later, surveillance video recorded what appears to be Ahmed's cab perform a u-turn in front of Masa. Thus, the surveillance video confirms King Cab's records showing that Ahmed picked up a passenger at Masa at 3:05 AM.

¶5 In the parking lot where police found Ahmed, police discovered a black knit cap, with a white stripe around the bottom and a logo for the Keg Steakhouse & Bar. Subsequent deoxyribonucleic acid (DNA) analysis showed that Ahmed's blood was on the outside of the cap in three to four places and that Fuller was the only source of DNA inside the hat. Investigators also found a single, 10-inch strand of wavy, brown, human hair inside the hat. Later DNA evaluation of that 10-inch hair strand established that Fuller could not be excluded as its source and that only 2 out of 1,674 Caucasians in the laboratory's database were possible sources.

¶6 Near where police officers found the Keg hat, officers discovered several 13-inch-long shoe impressions in a thin layer of bark dust leading out of the parking lot. The officers did not request plaster molds of these shoe prints because the prints lacked detail and were distorted.

¶7 Inside the cab, detectives found a one dollar bill and a King Cab business card on the floor beneath the left rear seat, neither of which had any trace of blood or latent fingerprints. The cab's center console and glove compartment were orderly and their contents seemed undisturbed. Ahmed's wallet was in the center console and, although it did not contain any money, it also appeared undisturbed. Inside Ahmed's right front jacket pocket, investigators found $209 in currency, partially sliced and saturated with blood.

¶8 Although investigators discovered several hairs in the rear of the cab, their investigation excluded Fuller as the source of those hairs. Similarly, the police were unable to link Fuller to the cab itself with fingerprint evidence.

¶9 The State charged Fuller with two counts of first degree murder for Ahmed's death: one count alleged felony murder based on first degree robbery or attempted robbery and a second count alleged premeditated murder.

## II. THE PROCEEDINGS

¶10 Before trial, the court conducted a CrR 3.5 hearing and explicitly found that police arrested and informed Fuller of his *Miranda*[3] rights. Fuller acknowledged he understood his rights, and he agreed to speak with detectives. The trial court further found that Fuller "did not invoke any of his rights and did not remain silent in response to any questions." Clerk's Papers (CP) at 46. Because Fuller made a knowing, voluntary, and intelligent waiver of his right to remain silent when he chose to speak to detectives, the trial court concluded that Fuller's post-arrest statements were admissible. Although Fuller moved in limine to prohibit it, the trial court ruled that "[Lead Homicide] Detective [Glenn] Miller may testify that, during the defendant's [postarrest] interrogation, the defendant never admitted or denied having committed the crime." CP at 48.

¶11 In its opening statement, the State summarized Miller's postarrest interview with Fuller. Specifically, the State claimed that in response to Miller's comment that the surveillance video showed Fuller wearing the Keg cap outside Masa on the night of the murder, Fuller "d[id]n't deny that, but he did say that said he'd like to see that video." Report of Proceedings (RP) (Feb. 3, 2010) at 14. Then, after further summarizing Fuller's interview with Miller, the State said that Fuller, "in the course of this interview, doesn't really admit or deny the murder, other than his initial claim that he was home that night." RP (Feb. 3, 2010) at 15. Fuller did not repeat his objection to either of these statements.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶12 Also during opening statement, the State gave a slide presentation outlining the State's argument. In this presentation, the State went through Fuller's interview with Miller, showing the jury slides that read, "Miller tells Fuller he saw him wearing the Keg cap on a video outside Masa. [Fuller] doesn't deny this, would like to see the video." Ex. 38, at 23. Other slides stated:

- [Miller] describes [Fuller] in third person [in a hypothetical based on Ahmed's murder].
- "He" loses his job at Yellow [C]ab.
- He's about to be evicted.
- He's pawning items.
- [Fuller] nodding to description of himself.
- [Miller]: "And in a moment of desperation he does something bad and someone ends up dead."

. . . .

- [Miller]: "Is this person a bad guy or just someone who made a mistake?"
- [Fuller]: "Someone that made a mistake."
- [Fuller] *doesn't really admit or deny* [the murder].

Ex. 38, at 23-24 (emphasis added). Although Fuller noted a continuing objection to the State's use of a slide presentation in its opening statement, Fuller did not repeat his unsuccessful objection to the State's use of these statements. The trial court instructed the jury that "anything that they . . . see, hear, or view during opening statements is not evidence; and they will only consider those remarks, statements, or photographs" that it admits as evidence during the trial. RP (Feb. 2 & 3, 2010) at 154-55.

¶13 At trial, the State introduced expert testimony regarding two surveillance videos. The State's expert testified that in the video of Fuller pawning his belongings on March 3, Fuller's clothes and stance were consistent with the unknown person in the March 8 Masa surveillance video wearing dark clothes and a dark hat. Although the State's

expert could not exclude the possibility that Fuller was in both an earlier March 3 pawn shop surveillance video and the Masa surveillance video, the videos were not sufficiently detailed for the expert to give a definitive opinion identifying the unknown man in the Masa video as Fuller.

¶14 The State also elicited testimony from Miller on Fuller's not denying being in the Masa surveillance footage.

[MILLER:]   I [told] him that I had video of him on Sixth Avenue on the night of the incident wearing his Keg cap, knowing that he had gotten into the cab [at Masa,] and that it was his Keg cap that was recovered at the scene.

[STATE:]   And what did the defendant say when you told him this?

[MILLER:]   He didn't make any attempt to deny the information . . .

. . . .

[MILLER:]   His comment to me was that he'd, actually, like to see the video.

RP (Feb. 16, 2010) at 907. Throughout trial, the State made several additional references to Fuller's failure to deny culpability for Ahmed's murder.[4]

¶15 The State's evidence further showed that Fuller owned a black knit cap with the Keg logo and a white stripe

---

[4] The State also elicited testimony from Fuller's friend, Zakee Perry, regarding Fuller's telephone call to Perry from jail, when Fuller told Perry that he had been arrested and charged with murder.

[STATE:]   . . . [Y]our friend calls you. You haven't talked to him in a week, and he tells you that he's calling you from the jail and that he's been arrested for murder; and this is the first you had heard of it at all. Did he ever tell you whether or not he committed the murder?

[PERRY:]   No. . . . [O]ther than him telling me what he was charged with, we didn't, actually, discuss it. He didn't say anything to me about it.

RP (Feb. 11, 2010) at 781. Because Perry is not a State actor, the partial silence doctrine does not apply to his testimony. See State v. Burke, 163 Wn.2d 204, 211, 181 P.3d 1 (2008). Although he objected at trial to this testimony, Fuller does not argue on appeal, and we do not decide, whether the trial court properly admitted these comments.

around the bottom that was indistinguishable from the hat police found at the crime scene. The State also presented evidence that these Keg hats were not available to the general public. Fuller had worked at one of the two local Keg Restaurants that distributed these hats to employees at a holiday party in December 2006 or 2007.

¶16 Fuller wore his Keg hat frequently, at least through December 2008. But Fuller told a friend that he lost his Keg hat in early March 2009, when he jumped out of a third story window while "do[ing] a collection." RP (Feb. 8, 2010) at 425-26. Miller testified that in his first conversation with Fuller, Fuller volunteered that he used to have a Keg hat like the one found at the crime scene. Fuller told Miller both that (1) he had the hat for awhile and wore it but had since gotten rid of it and (2) he got it at a holiday party but gave it away immediately.

¶17 The State's evidence also showed that Fuller was under financial duress in early 2009 and was facing eviction from his apartment. This evidence included testimony and surveillance video footage of Fuller pawning his belongings on March 3 and testimony that Fuller was out of work for much of early 2009. Although Fuller was a Yellow Cab driver for about a year, he lost the cab lease for nonpayment on January 15, 2009. Additionally, Fuller was evicted from his apartment in late March 2009 and stayed with friends thereafter.

¶18 Over Fuller's objection, the State presented evidence that before Fuller was evicted from his apartment, Fuller told his friend Michael Stafford that "he had been . . . approached . . . about doing a robbery for somebody else" and that he was planning on going forward with it. RP (Feb. 11, 2010) at 795. But Fuller eventually told Stafford that the planned robbery fell through and was not going to happen. Detectives testified that they did not find any evidence in Ahmed's cab to either prove or disprove that he was killed during a robbery.

¶19 Fuller often carried knives, including a knife with a seven-or-eight-inch blade that he wore in a shoulder holster. There was testimony that as of March 13, Fuller "looked a little scuffed." RP (Feb. 11, 2010) at 777. Specifically, Fuller had a "couple of red marks . . . like, scratches on his face[,]" but those scratches looked like they were healing and did not cause Fuller's friend alarm. RP (Feb. 11, 2010) at 777.

¶20 The State introduced other evidence that after Fuller's eviction, the apartment's maintenance man cleaned out Fuller's apartment, bagging up "junk" and throwing it away. RP (Feb. 10, 2010) at 706-07. In their search of the Tacoma landfill, police found and collected several garbage bags and boxes containing documents with Fuller's name on them. In the same vicinity of the dump where the documents were found bearing Fuller's name, officers found a plastic bag containing long brown hair and two copies of the *The News Tribune*—a Tacoma daily newspaper—dated March 9 and March 10, both of which had cover stories about Ahmed's murder. For 10 years before Ahmed's death, Fuller had long, wavy, dark brown hair, which he wore in a ponytail and described as his "pride and joy," but Fuller shaved his head sometime in early March 2009. RP (Feb. 8, 2010) at 441. Fuller gave a friend two different explanations for shaving his head: one, because he wanted to join the Navy SEALs and, two, so employers would take him seriously. Police were not able to discern any fingerprints on the newspapers, but determined that the bagged hair was similar to hair found on Fuller's bathroom floor and on a pair of scissors in Fuller's apartment.

¶21 Evidence recovered from the search of Fuller's room at his friend's house included Fuller's black boots with 13.5-inch soles, which were well-worn and did not have much tread remaining on them. Although the State did not find any blood evidence on the boots, investigators testified that the boots were consistent with the 13-inch shoe impressions leading through the bark dust away from the cab where Ahmed's body was found.

¶22 The State also presented evidence that Fuller told friends and former colleagues that he did not like "foreigners" because "[t]hey were taking our jobs." RP (Feb. 8, 2010) at 479. Fuller further lamented the difficulty of finding work and stated that "he hated King Cab because . . . all they hired w[ere] Somali[ ] drivers." RP (Feb. 8, 2010) at 434-35. Fuller stated that he had applied for work with King Cab but that they would not hire him because he was not Somali.

¶23 All King Cab vehicles, including Ahmed's cab, were equipped with a panic button but Ahmed did not press his. King Cab's panic buttons were generally known in the local community of cab drivers. The State argued that because Fuller was a cab driver for Yellow Cab and also had driven for a short time for Farwest Cab in Tacoma, he would have known about King Cab's panic buttons and must have told Ahmed not to push it. Fuller was familiar with the secluded road where Ahmed was found because it was the back entrance to Tacoma Yellow Cab's facility and was also near Fuller's apartment.

¶24 Fuller did not testify, nor did he present any witnesses.

¶25 Then, in closing argument, the State again referred to Fuller's failure to deny Miller's accusations, "[Fuller] was in the [Masa] area; thus, giving him the opportunity to commit the crime. He doesn't admit that to Detective Miller." RP (Feb. 17, 2010) at 10. The State continued:

> [W]e . . . know the defendant was aware of the significance of the Keg cap.
>
> He knew he left his cap behind and he knew it was mentioned in the News Tribune articles, so that's why he's making up the story about [giving away] the Keg cap [on the night he received it]. He didn't, however, give consistent stories about the Keg cap . . . . Detective Miller called him on this and saw him wearing the Keg cap on the video outside Masa. *The defendant doesn't deny this.* He just says that he would like to see that video.

RP (Feb. 17, 2010) at 57-58 (emphasis added). Again, Fuller did not repeat his objection to admission of these statements.

¶26 The State also made a slide presentation during its closing argument. As in its opening statement slide presentation, these slides emphasized the State's argument; for example, "Miller tells Fuller he saw him wearing the Keg cap on a video outside Masa. [Fuller] doesn't deny this, would like to see the video." Ex. 261, at 7. Fuller did not repeat his standing objection to the State's use of this evidence in its closing argument.

¶27 Also, in closing argument, the State asked the jury to return a just verdict and analogized its burden to prove the charges beyond a reasonable doubt to a jigsaw puzzle. Fuller unsuccessfully objected to the State's use of the jigsaw puzzle because it minimized the State's burden of proof. Fuller did not object to the State's argument that the jury should return a just verdict.

¶28 The jury found Fuller guilty of first degree felony murder and first degree premeditated murder, both with a deadly weapon. At sentencing, the trial court merged the two convictions and entered a judgment and sentence only on first degree murder with a deadly weapon[5] enhancement. Fuller appeals.

## ANALYSIS

### I. PROSECUTORIAL MISCONDUCT

¶29 Fuller argues that we must dismiss his first degree murder conviction because the State engaged in prejudicial misconduct by (1) commenting on Fuller's postarrest partial silence as a tacit admission of guilt, (2) appealing to the jury's passions and prejudices, and (3) minimizing the State's burden of proof. We agree that the State improperly elicited testimony on Fuller's postarrest partial silence and

---

[5] RCW 9.94A.125; .602.

improperly commented on it as substantive evidence of his guilt. Because these arguments were prejudicial to Fuller, we are compelled to reverse his conviction and remand for a new trial. But we reject Fuller's arguments that the State appealed to the jury's passions or prejudices or that it · minimized its burden of proof, issues we address because they may arise on remand.

### A.  Standards of Review

¶30 Prosecuting attorneys are quasi-judicial officers who have a duty to ensure that defendants receive a fair trial. *State v. Boehning*, 127 Wn. App. 511, 518, 111 P.3d 899 (2005). Prosecutorial misconduct violates this duty and can constitute reversible error. *Boehning*, 127 Wn. App. at 518. We review allegedly improper statements by the State in the context of the argument as a whole, the issues involved in the case, the evidence referenced in the statement, and the trial court's jury instructions. *State v. Anderson*, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010).

¶31 Where a defendant meets the burden of establishing both that (1) the State committed misconduct by making inappropriate remarks and (2) those remarks had prejudicial effect, we reverse the defendant's conviction. *Anderson*, 153 Wn. App. at 427; *Boehning*, 127 Wn. App. at 518. If a defendant establishes that the State made improper statements, then we review whether those improper statements prejudiced the defendant under one of two different standards of review. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

¶32 First, where the defendant preserved the issue by objecting at trial, we evaluate whether there was a substantial likelihood that the improper comments prejudiced the defendant by affecting the jury. *Emery*, 174 Wn.2d at 760; *Anderson*, 153 Wn. App. at 427. But if the defendant failed to object to the improper argument at trial, we employ a different standard of review. *See Emery*, 174 Wn.2d at

760-61. Under this second, heightened standard, the defendant must show that the State's misconduct "was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. This more stringent standard of review requires the defendant to show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' " *Emery*, 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). In conducting this analysis, we focus more on whether the prejudice resulting from the State's misconduct could have been cured. *Emery*, 174 Wn.2d at 762. However, where the State's misconduct violates a defendant's constitutional rights, we analyze the prejudice to the defendant under a different standard; in such instances, we apply the constitutional harmless error standard. *Emery*, 174 Wn.2d at 757; *see also State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011); *State v. Fricks*, 91 Wn.2d 391, 396-97, 588 P.2d 1328 (1979).

¶33 Eliciting testimony about and commenting on a suspect's postarrest silence or partial silence is constitutional error and subject to our stringent constitutional harmless error standard. *State v. Easter*, 130 Wn.2d 228, 236-37, 242, 922 P.2d 1285 (1996). Under this standard, we presume constitutional errors are harmful and reverse and remand for a new trial unless the State meets the heavy burden of establishing that the constitutional error was harmless beyond a reasonable doubt. *Easter*, 130 Wn.2d at 242; *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). A constitutional error is harmless beyond a reasonable doubt only if the evidence is so overwhelming that any rational trier of fact would necessarily have found the defendant guilty. *Easter*, 130 Wn.2d at 242; *Guloy*, 104 Wn.2d at 425.

### B. State Improperly Commented on Fuller's Postarrest Partial Silence

¶34 Fuller argues that the State committed prejudicial misconduct by commenting on Fuller's postarrest partial silence, referring to the fact that Fuller did not deny the allegations against him and using Fuller's partial silence as substantive evidence of his guilt. The State argues that Fuller waived his right to silence and elected to speak to investigators and, thus, the State properly impeached Fuller's theory of the case, even though Fuller did not testify. But the State does not elaborate on any theory Fuller presented that it could impeach.

¶35 Our courts have assiduously protected a suspect's constitutional right to remain silent, which we liberally construe. *Easter*, 130 Wn.2d at 236. As we stated in *State v. Slone*,

> [u]nder the Fifth Amendment to the United States Constitution, no person shall be compelled to witness against himself in a criminal case. We similarly interpret our Washington state constitutional provision against self-incrimination[, article I, section 9]. In either pre-arrest or post-arrest situations, every person has the right to remain silent, which silence cannot be used as substantive evidence of guilt. Accordingly, the State cannot elicit comments from a witness that are related to a defendant's silence or make such comments during closing arguments in order to infer guilt.

133 Wn. App. 120, 126-27, 134 P.3d 1217 (2006) (citations omitted).

¶36 The Ninth Circuit has also held that after a person receives *Miranda* warnings, even if he or she elects to speak with law enforcement, he or she may invoke the right to silence in response to *any* question posed by law enforcement. *Hurd v. Terhune*, 619 F.3d 1080, 1087 (9th Cir. 2010). The Ninth Circuit has explicitly held that "the right to silence is not an all or nothing proposition. A suspect may remain selectively silent by answering some questions and

then refusing to answer others without taking the risk that his silence may be used against him at trial." *Hurd*, 619 F.3d at 1087.

¶37 Thus, Ninth Circuit precedent clearly establishes that the federal constitution protects a suspect's postarrest partial silence. *Hurd*, 619 F.3d at 1087. Other circuits agree. *See United States v. May*, 52 F.3d 885, 890 (10th Cir. 1995) (holding that the law clearly protects partial silence and allows a suspect to answer some questions posed by law enforcement while declining to answer others); *United States v. Scott*, 47 F.3d 904, 907 (7th Cir. 1995) (holding that the United States Supreme Court's *Doyle*[6] decision allows a suspect to refuse to answer certain questions with the assurance that the State cannot use that partial silence against him or her at trial).

¶38 While law enforcement may not be required to cease an interview if the suspect responds to certain questions but "remains 'largely silent' in response to [police] officers' questions," a suspect's silence or refusal to respond is inadmissible at trial. *Hurd*, 619 F.3d at 1088. This type of post-*Miranda* partial silence is inadmissible because it is inherently "ambiguous because it may be no more than a reliance on the right to silence." *Hurd*, 619 F.3d at 1088; *see also Doyle*, 426 U.S. at 618-19.

¶39 Because the Fifth Amendment to the United States Constitution grants suspects the right to silence, it is " 'fundamentally unfair and a deprivation of due process' to allow [the State to use] a suspect's silence . . . against him at trial." *Hurd*, 619 F.3d at 1089 (quoting *Doyle*, 426 U.S. at 618)). Even when the State may use a defendant's statements at trial, the suspect may exercise the right to silence in response to any question and the State cannot use that partial silence against him at trial.[7] *Hurd*, 619 F.3d at 1088; *see also*

---

[6] *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

[7] We note that where a suspect waives the right to silence, agrees to speak with law enforcement, later elects to testify in his or her defense, and gives an

*Berghuis v. Thompkins*, 560 U.S. 370, 375, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010); *Slone*, 133 Wn. App. at 127. And our State respects and enforces this restriction on the use of silence as substantive evidence. *See Slone*, 133 Wn. App. at 127 (holding that the State cannot use a suspect's postarrest silence as substantive evidence of guilt).

¶40 Here, Fuller invoked his right to partial silence in not responding to some of Miller's questions or statements during the custodial interrogation. Thus, the State could not elicit testimony or comment on Fuller's partial silence to infer his guilt. *Slone*, 133 Wn. App. at 127. But the trial court allowed the State to elicit testimony from Miller that Fuller did not deny being in the Masa surveillance video and did not deny his guilt, both instances of constitutionally protected silence. And the State further used his silence when it commented in opening statement and in closing argument that Fuller never denied being in the Masa video and never denied guilt.

¶41 Moreover, during its opening and closing, the State buttressed its arguments of Fuller's guilt by showing the jury slides that reiterated Fuller's failure to deny being at Masa and his failure to deny culpability for the murder. Given the evidence and circumstances here, we conclude that the only possible inference from this testimony and from the State's opening statement and argument is that Fuller is guilty because he did not deny his presence at the Masa scene or deny committing Ahmed's murder.

¶42 In *State v. Curtiss*, 161 Wn. App. 673, 684-86, 250 P.3d 496, *review denied*, 172 Wn.2d 1012 (2011), before the suspect was under arrest, police officers informed her of her

---

inconsistent statement, the State may introduce evidence of the person's prior inconsistent statements for impeachment purposes only. *Hurd*, 619 F.3d at 1086-87. Even when the State may impeach a testifying defendant with his or her prior inconsistent statements to police, the State may not use those statements as substantive evidence of guilt. *Hurd*, 619 F.3d at 1087. Although the State may impeach a testifying defendant with a prior inconsistent *statement*, under no circumstances can the State introduce evidence of the defendant's postarrest *silence* as substantive evidence of guilt. *Hurd*, 619 F.3d at 1087.

*Miranda* rights and asked her to provide a series of statements. She agreed, waived her *Miranda* rights, did not reinvoke them, and made several recorded and unrecorded statements to police in response to their questions. *Curtiss*, 161 Wn. App. at 684-86. But she did not answer all of the officers' questions; specifically, when an investigating officer accused her of committing solicitation to commit murder, "[she] did not initially respond to the accusations *or deny them*, but eventually responded[,] saying, 'I don't know if I was there . . . . I don't think I was.' " *Curtiss*, 161 Wn. App. at 686 (emphasis added) (quoting *Curtiss* 6 Report of Proceedings at 173). At trial, Curtiss testified that she was not present during the murder and that she first learned about the murder after it was committed. *Curtiss*, 161 Wn. App. at 687.

¶43 At the conclusion of the CrR 3.5 hearing in *Curtiss*, the trial court entered a written finding of fact that Curtiss " '[a]t no time throughout the interview with [Curtiss,] *including the exchange that occurred after the recorder had been turned off*, did [Curtiss] invoke her right to remain silent.' " 161 Wn. App. at 692 (alterations in original). Because Curtiss did not challenge that finding of fact, it was a verity on appeal. *Curtiss*, 161 Wn. App. at 692.

¶44 We considered in *Curtiss* whether the State had improperly violated Curtiss's right to remain silent. We specifically noted that "*Miranda* warnings themselves carry the implicit assurance that the defendant's silence will carry no penalty." *Curtiss*, 161 Wn. App. at 692 (citing *Doyle*, 426 U.S. at 618; *State v. Belgarde*, 110 Wn.2d 504, 511, 755 P.2d 174 (1988)). But we held that "[b]ecause Curtiss did not invoke her right to remain silent during questioning, [the detective']s testimony regarding her lack of a response to certain interview questions was not improper." *Curtiss*, 161 Wn. App at 692.

¶45 The Washington Supreme Court addressed another challenge to the State's use of postarrest silence in *State v. Young*, 89 Wn.2d 613, 574 P.2d 1171 (1978). In *Young*, the

court concluded that the right to silence was not implicated when a suspect was arrested and properly given *Miranda* warnings, and then waived his rights by making a series of spontaneous statements to officers that were not in response to questioning and, in the presence of officers, spontaneously called out to a third person. 89 Wn.2d at 619-20. The *Young* court held that the officers properly testified about the suspect's postarrest, post-*Miranda*, spontaneous statements. 89 Wn.2d at 620. Also in *Young*, during closing argument, the State asked the jury, " '[D]id you hear in any of the testimony [of the arresting officers] that the defendant denied that he [committed the crime] or had anything to do with . . . it?' " *Young*, 89 Wn.2d at 620. The court held that the State did not commit misconduct by commenting that the suspect did not deny his guilt because Young had voluntarily waived his right to remain silent and that his questions and comments showed knowledge of the crime. *Young*, 89 Wn.2d at 621.

¶46 Here, unlike in *Curtiss*, Fuller did not testify at trial and his statements to Miller did not show knowledge of the crime, as they did in *Young*. Because Fuller exercised his right to partial silence during custodial interrogation by law enforcement and did not make any spontaneous statements to third parties in the presence of officers, *Young* does not control.

¶47 Importantly, Fuller did not testify and the State's use of testimony about his refusal to deny Miller's statements during custodial interrogation could not, therefore, impeach his testimony. Although the State argues it used Fuller's postarrest partial silence to impeach his theory of the case, it does not identify any trial theory Fuller advanced at trial. Fuller's counsel argued that the State failed to prove beyond a reasonable doubt that Fuller committed Ahmed's murder. This is not a defense theory the State may attack by using the defendant's constitutionally protected silence. Because the State fails to identify any defense theory that it "impeached" with evidence of Fuller's postarrest partial silence,

we decline the State's request to extend *Curtiss* to allow the State to "impeach" a nontestifying defendant about his or her postarrest partial silence. Accordingly, *Curtiss* does not control.

¶48 Here, the State used its arguments about Fuller's failure to deny being at Masa and failure to deny committing the crime solely as substantive evidence of his guilt. Because of this constitutional error, we must reverse Fuller's conviction unless the State meets its burden to show that the evidence and arguments were not prejudicial to Fuller and were not harmless beyond a reasonable doubt.

C. The State's Misconduct Prejudiced Fuller and Was Not Harmless Beyond a Reasonable Doubt

¶49 A constitutional error is harmless beyond a reasonable doubt only if the evidence is so overwhelming that any rational trier of fact would necessarily have found the defendant guilty. *Easter*, 130 Wn.2d at 242; *Guloy*, 104 Wn.2d at 425. Here, the evidence is not overwhelming.

¶50 The State's evidence showed that Fuller (1) owned a Keg cap similar to the Keg cap found near Ahmed's body and seen in the video outside Masa, and that the cap had Ahmed's DNA on the outside and only Fuller's DNA inside; (2) wore his hair long until sometime before he was evicted from his apartment and that a long strand of hair, which forensic testing could not rule out as Fuller's, was found in the hat; (3) had financial difficulties; (4) possessed newspapers with stories about Ahmed's murder; (5) may have been prejudiced against or angry at the King Cab company for hiring only Somali drivers; (6) carried a long-bladed knife in a holster on his body; (7) owned shoes size 13.5, close to the size of shoe impressions leading away from the cab where Ahmed's body was found; and (8) was familiar with taxicab emergency buttons and the area where the cab was found because it was near his apartment and also near the back entrance to Tacoma Yellow Cab, where Fuller had been employed.

¶51 But the State produced no witnesses or direct evidence placing Fuller at Masa or inside Ahmed's cab. The State's expert could not opine that Fuller was the person in the Masa surveillance video wearing dark clothes and a hat that appeared similar to the Keg cap at the crime scene. The State found none of Fuller's DNA on Ahmed's body and the evidence showed that none of Ahmed's DNA was on Fuller's boots or clothes. And the State could not show that Ahmed was robbed. The State's circumstantial evidence was strong but the State's evidence was not so overwhelming that any rational trier of fact would necessarily have found Fuller guilty. Accordingly, we are compelled to reverse Fuller's conviction and remand for a new trial based on the State's use of Fuller's postarrest partial silence during his custodial interrogation when Fuller did not testify and his statements showed no knowledge of the crime or circumstances of Ahmed's murder. *Easter*, 130 Wn.2d at 242; *Guloy*, 104 Wn.2d at 425.

¶52 We next address two prosecutorial misconduct issues Fuller raises because they may arise on remand.

### 1. State Did Not Improperly Appeal to Juror's Emotions

¶53 Fuller next argues that the State committed two instances of prejudicial misconduct by appealing to the jurors' emotions and thereby asked them to convict based on emotions rather than the evidence. We disagree.

¶54 Fuller argues that the first improper appeal to the jury's emotions occurred when, over Fuller's objection, the State argued that Fuller

slashed Moham[u]d Ahmed's throat, stabbed him in the chest[,] and almost severed his fingers. He left him to die, to bleed to death like a wounded animal, alone in the dark in the cold and afraid. For what? Why did he do this? What did Moham[u]d Ahmed do to deserve this?

He came to the United States to seek a better life for himself from a [war] torn Somalia.

. . . .

. . . For that he suffered [Fuller's] hatred.

RP (Feb. 17, 2010) at 6.

¶55 The State has wide latitude to comment on the evidence introduced at trial and to draw inferences from that evidence. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). But the State commits misconduct by asking the jury to convict based on their emotions, rather than the evidence. *State v. Bautista-Caldera*, 56 Wn. App. 186, 194-95, 783 P.2d 116 (1989). Fuller cites *Bautista-Caldera* to support his argument that the State improperly appealed to the jury's emotions.

¶56 In *Bautista-Caldera*, a child sex abuse case, the State asked the jury to " 'think of all the children,' " highlighted the vulnerability of the young victim, and argued, " '[D]o not tell that child that this type of touching is okay, that this is just something that she will have to learn to live with. Let her and children know that you're ready to believe them and [e]nforce the law on their behalf.' " 56 Wn. App. at 194-95 (emphasis omitted) (alteration in original). Division One of this court held that those comments improperly appealed to the jury's emotions and "exhort[ed] the jury to send a message to *society*." *Bautista-Caldera*, 56 Wn. App. at 195.

¶57 Here, the State's argument, although emotional, did not urge the jury to convict based on emotion rather than the evidence and did not exhort the jury to send a message to society. Instead, the State was commenting on the evidence presented at trial in accordance with *Fisher*. The evidence showed that Ahmed's throat was slashed, he was stabbed in the chest, his fingers were almost severed, and he bled to death in the cold. The evidence also showed that Ahmed emigrated from Somalia, Fuller hated foreigners for taking American jobs, and Fuller specifically hated King Cab for hiring only Somali drivers. Accordingly, the State did not commit misconduct in making this argument.

¶58 Even if we were to assume that the State committed misconduct, it did not prejudice Fuller because there is not

a substantial likelihood that it affected the jury's verdict. *See Emery*, 174 Wn.2d at 760-61. Thus, this statement did not prejudice Fuller. Accordingly, his argument fails.

¶59 Fuller argues that the second improper appeal to the jury's emotions occurred when the State asked for a just verdict. Without objection, the State argued:

> There is nothing we can do obviously to bring back Mr. Ahmed. But you have an opportunity to bring back a verdict that is just; justice for the defendant, justice for Mr. Ahmed, and justice for the community. So I'm going to ask you to return the only verdict that will be just in this case, and that's guilty as charged.

RP (Feb. 17, 2010) at 62. Because Fuller did not object to this statement, he must show that it was so flagrant and ill intentioned that no curative jury instruction could have corrected the possible prejudice. *Emery*, 174 Wn.2d at 760-61. It is not misconduct for the State to ask the jury to return a just verdict supported by the evidence. *Curtiss*, 161 Wn. App. at 701.

¶60 Before the State asked the jury to return a just verdict, it emphasized the elements that the State had to prove for the jury to convict, discussed all of the evidence presented, and asked the jury to "carefully consider all the evidence . . . presented in this case and . . . return a verdict of guilty." RP (Feb. 17, 2010) at 31. And the trial court instructed the jury that their "decisions as jurors must be made solely upon the evidence presented during these proceedings" and that "[y]ou must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference." CP at 111.

¶61 We recently concluded that the State did not commit misconduct by calling on the jury to return a just verdict when the context showed that it also stated that the jury " 'need[ed] to be careful in their consideration of the evi-

dence.' " *Anderson,* 153 Wn. App. at 429 (quoting *Anderson* Br. of Resp't. at 17). Moreover, we also recently concluded that the State did not appeal to the jury's emotion by stating, " 'Do you know in your gut—do you know in your heart that [the defendant] is guilty . . . ? The answer is yes. . . . We are asking you to return a verdict that you know is just, a verdict of guilty.' " *Curtiss,* 161 Wn. App. at 701-02 (quoting *Curtiss* 9 Report of Proceedings at 686).

¶62 Moreover, even if we were to assume the State did commit misconduct by asking the jury to return a just verdict and even if we were to assume that misconduct was flagrant and ill intentioned such that Fuller could raise it for the first time on appeal, it did not prejudice him in a manner that could not have been cured by objection and a curative jury instruction. *Emery,* 174 Wn.2d at 760-61. The trial court correctly instructed the jury to base its decisions only on the evidence and Fuller cannot show that any misconduct in the State's argument prejudiced him. Because the State asked the jury to return a verdict that was both supported by the evidence and just, it did not commit misconduct and Fuller's argument fails.

### 2. State Did Not Minimize Its Burden of Proof

¶63 Fuller also argues that the State committed misconduct by drawing an inappropriate analogy that minimized the State's beyond a reasonable doubt burden of proof. We disagree.

¶64 Over Fuller's objection, the State made extensive comments about its burden of proof. The State argued:

> Now, I want to talk a little bit about the concept of beyond a reasonable doubt. The key[ ]word there is "reasonable." Nothing in this world is 100 percent certain and nothing in a courtroom is 100 percent certain. We just need to prove the elements of the crime beyond a reasonable doubt.
>
> . . . All we need to prove beyond a reasonable doubt are the elements of a crime, and you will have in your jury instructions the elements of the crime.

. . . .

This, in fact, is the instruction that talks about beyond a reasonable doubt.[8] I want to highlight the last sentence of this instruction. You will have it back in the jury room in its entirety: "If, after such consideration, you have an abiding belief in the truth of the charge you are satisfied beyond a reasonable doubt." An abiding belief in the truth of the charge because this is, after all, a truth-seeking process.

What I am going to do now is use a jigsaw puzzle to illustrate the concept of beyond a reasonable doubt. Let's say that someone is telling us that this is a picture of Tacoma. We get a few of the pieces of the puzzle. We get a few pieces of evidence and this is what we can see. From that we might think it looks like Tacoma, but we don't know—

. . . .

So we look at that portion of the puzzle and we do not have enough pieces or enough evidence beyond a reasonable doubt that it's pieces of Tacoma.[9] But let's say we get some more pieces. Now, we have more pieces, more evidence that suggests this is Tacoma. But we may not yet have enough pieces, enough evidence to know beyond a reasonable doubt that it's Tacoma.

Now, we have more pieces. We have more evidence and we can see beyond a reasonable doubt that this is a picture of Tacoma. We can see the freeway. We can see Mount Rainier and we can see the Tacoma Dome.

A trial is very much like a jigsaw puzzle. It's not like a mystery novel or [the *Crime Scene Investigation* television series (CSI)] or a movie. You're not going to have every loose end tied up and every question answer[ed]. What matters is this: Do you have enough pieces of the puzzle? Do you have enough evidence to believe beyond a reasonable doubt that the defendant is guilty?

Beyond a reasonable doubt, you just need enough pieces of the puzzle, enough evidence to have an abiding belief in the

---

[8] The State used a slide showing the text of the beyond a reasonable doubt instruction.

[9] During this portion of the argument, the State showed a series of slides depicting a jigsaw-type puzzle of the Tacoma Dome, with each successive slide adding a piece to the puzzle.

truth of the charge; to believe in the truth that the defendant attempted to rob Moham[u]d Ahmed; to believe in the truth that the defendant murdered Moham[u]d Ahmed.

RP (Feb. 17, 2010) at 58-61.[10]

¶65 In arguing that this statement was prejudicial prosecutorial misconduct, Fuller relies on two of our decisions that held that the State committed prejudicial misconduct by minimizing the State's burden of proof, *Anderson* and *State v. Johnson*, 158 Wn. App. 677, 243 P.3d 936 (2010), *review denied*, 171 Wn.2d 1013 (2011). In *Anderson*, we held that the State committed prejudicial misconduct by analogizing its beyond a reasonable doubt burden of proof to everyday decisions the jurors made, including deciding whether to have elective surgery, dental surgery, to leave their children with a baby-sitter, and changing lanes on the freeway. 153 Wn. App. at 425, 431. Even though the trial court correctly instructed the jury on the State's burden of proof and also that the lawyers' statements were not evidence, we held that the challenged statements were improper because they trivialized the beyond a reasonable doubt standard by minimizing "the importance of the [beyond a] reasonable doubt standard and of the jury's role in determining whether the State ha[d] met its burden." *Anderson*, 153 Wn. App. at 431.

¶66 We have viewed the State's use of the jigsaw puzzle analogy on a case-by-case basis, considering the context of the argument as a whole. *Curtiss*, 161 Wn. App. at 700-01; *Johnson*, 158 Wn. App. at 682-86; *Anderson*, 153 Wn. App. at 425-31. For example, in *Johnson*, we reversed the conviction and remanded for a new trial because the State's puzzle argument trivialized the State's burden of proof by analo-

---

[10] The State also showed the jury a slide during closing argument that summarized its statements on its burden of proof. This slide read, "Beyond a reasonable doubt: enough pieces of the puzzle, enough evidence, to have an abiding belief in the truth of the charge." Ex. 261, at 12. We do not separately analyze the slide because it summarized the State's comments and the record does not establish that the slide had a disproportionate impact on the jury.

gizing the abiding belief necessary to be convinced of the defendant's guilt beyond a reasonable doubt to the abiding belief necessary to determine the image depicted in a partially completed puzzle. 158 Wn. App. at 682-86. Importantly, in analogizing its burden of proof to a partially completed puzzle, the State in *Johnson* argued, " 'You add a *third* piece of the puzzle, and at this point *even being able to see only half*, you can be assured beyond a reasonable doubt that this is going to be a picture of Tacoma.' " *Johnson*, 158 Wn. App. at 682 (emphasis added) (quoting 3 *Johnson* Report of Proceedings at 204). The State thus quantified the level of certainty required to satisfy its burden of proof. Moreover, the State also committed several other instances of flagrant and ill intentioned misconduct that although the trial court gave correct jury instructions, which this court presumed it followed, the prejudice was incurable. *Johnson*, 158 Wn. App. at 685-86.

¶67 But in another case, we held that the puzzle analogy was not improper. *Curtiss*, 161 Wn. App. at 700-01. In *Curtiss* the State's explanation was:

> "[R]easonable doubt is not magic. This is not an impossible standard. Imagine, if you will, a giant jigsaw puzzle of the Tacoma Dome. There will come a time when you're putting that puzzle together, and even with pieces missing, you'll be able to say, with some certainty, beyond a reasonable doubt what that puzzle is: The Tacoma Dome."

161 Wn. App. at 700 (alteration in the original) (quoting *Curtiss* 8 Report of Proceedings at 640-41). This puzzle analogy did not minimize the State's burden of proof because it did not purport to quantify the level of certainty required to satisfy the beyond a reasonable doubt standard, nor did it minimize or shift the burden of proof to the defendant in the context of the argument as a whole and the trial court's correct jury instructions. *Curtiss*, 161 Wn. App. at 700-01. Thus, the analogy did not rise to the level of misconduct. *Curtiss*, 161 Wn. App. at 700-01.

¶68 Here, the State used a puzzle analogy in closing argument, stating:

> What I am going to do now is use a jigsaw puzzle to illustrate the concept of beyond a reasonable doubt. . . . We get a few of the pieces of the puzzle. . . . [W]e might think it looks like Tacoma, but we don't know—
>
> . . . .
>
> . . . [W]e do not have enough pieces or enough evidence beyond a reasonable doubt that it's [a picture] of Tacoma. But let's say we get some more pieces. . . . But we may not yet have enough pieces, enough evidence to know beyond a reasonable doubt that it's Tacoma.
>
> Now, we have more pieces. We have more evidence and we can see beyond a reasonable doubt that this is a picture of Tacoma. . . .
>
> A trial is very much like a jigsaw puzzle. It's not like a mystery novel or CSI or a movie. You're not going to have every loose end tied up and every question answer[ed]. What matters is this: Do you have enough pieces of the puzzle? Do you have enough evidence to believe beyond a reasonable doubt that the defendant is guilty?

RP (Feb. 17, 2010) at 60-61. The State then asked the jury if it had "enough pieces of the puzzle, enough evidence to have an abiding belief in the truth of the charge." RP (Feb. 17, 2010) at 61.

¶69 Thus, the State neither equated its burden of proof to making an everyday choice nor quantified the level of certainty necessary to satisfy the beyond a reasonable doubt standard. The State did say, however, that the jury could be convinced beyond a reasonable doubt even without 100 percent certainty. That statement did not improperly quantify its burden. Moreover, the State accurately stated that it had to prove every element of the crime charged and further referenced the trial court's actual instruction on beyond a reasonable doubt. The trial court correctly instructed the jury that Fuller "was presumed innocent," that the "State . . . ha[d] the burden of proving each element of

each crime beyond a reasonable doubt," and that the "lawyers' statements are not evidence." CP at 112, 110.

¶70 The specific puzzle analogy the State employed here, like the analogy we held to be proper in *Curtiss*, discussed identifying a puzzle with certainty before it was complete without purporting to quantify the degree of certainty required or equating identifying the image with making a mundane choice. Unlike in *Anderson*, the comments did not minimize the State's burden of proof. Thus, Fuller's claim that the State erred in using its puzzle reference here fails.

II. PROPENSITY EVIDENCE UNDER ER 404(b)

¶71 Fuller also argues that the trial court abused its discretion in allowing the State to elicit testimony—as evidence of his motive to rob Ahmed—that Fuller first told an acquaintance that he would commit robbery for hire and then told the same acquaintance that the robbery plan was cancelled before Ahmed's murder. We agree. Even though we reverse Fuller's conviction based on prosecutorial misconduct as analyzed above, we address this issue because it may arise on remand and because it provides an alternative reason for reversal of Fuller's conviction. We hold that the trial court abused its discretion in failing to analyze the admission of the evidence under ER 404(b) and that admission of this evidence was not harmless.

A. State Introduced Inadmissible Propensity Evidence, Not Evidence of Motive

¶72 We review a trial court's decision to admit or deny evidence of a defendant's past crimes or bad acts under ER 404(b) for an ·abuse of discretion. *Fisher*, 165 Wn.2d at 745. A trial court abuses its discretion by not following the requirements of ER 404(b) in admitting evidence of a defendant's prior convictions or past acts. *Fisher*, 165 Wn.2d at 744-45.

¶73 Before a trial court admits evidence under ER 404(b), it must "(1) find by a preponderance of the

evidence the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value against the prejudicial effect of the evidence." *Fisher*, 165 Wn.2d at 745. We presume that evidence of a defendant's past acts is inadmissible and resolve any doubts on whether to admit the evidence in the defendant's favor. *State v. Nelson*, 131 Wn. App. 108, 115, 125 P.3d 1008 (2006).

¶74 Evidence of a defendant's past crimes or bad acts is not admissible to show that the defendant likely committed the crime charged, that the defendant acted in conformity with prior bad acts, or that the defendant had a propensity to commit the crime. ER 404(b); *State v. Baker*, 162 Wn. App. 468, 472-73, 259 P.3d 270, *review denied*, 173 Wn.2d 1004 (2011). But evidence of a defendant's past crime or bad act may be admissible for another purpose, including showing the defendant's motive. *Baker*, 162 Wn. App. at 473. For ER 404(b) purposes, motive " 'goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act.' " *Baker*, 162 Wn. App. at 473-74 (quoting *State v. Powell*, 126 Wn.2d 244, 259, 893 P.2d 615 (1995)).

¶75 Although the State may introduce evidence of motive even if motive is not an essential element of the crime charged, the State may not show motive by introducing evidence that the defendant committed or attempted to commit an unrelated crime in the past. *Baker*, 162 Wn. App. at 473-74; *State v. Yarbrough*, 151 Wn. App. 66, 83, 210 P.3d 1029 (2009). For example, the State cannot show a defendant's motive to commit rape by introducing evidence that he assaulted a different woman years earlier because it is both irrelevant to the defendant's motive for committing rape and unfairly prejudicial. *State v. Saltarelli*, 98 Wn.2d 358, 365, 655 P.2d 697 (1982). And even when the State's proposed evidence is relevant to show motive, a trial court must evaluate ER 404(b) evidence under ER 403, which

requires the trial court to exercise its discretion in excluding relevant evidence if its undue prejudice substantially outweighs its probative value. *Fisher*, 165 Wn.2d at 745.

¶76 Over Fuller's unsuccessful objection, the State introduced Stafford's testimony that shortly before Ahmed was killed, Fuller told Stafford that someone was going to pay him to commit a $10,000 robbery at night, with Fuller wearing a mask. Fuller later told Stafford that the planned robbery was not going to happen. Here, the State charged Fuller with felony murder, with first degree robbery or attempted robbery as the predicate felony. It successfully argued to the trial court that evidence of Fuller's failed plan to commit a robbery for hire before Ahmed's murder was relevant to show that Fuller's predicate motive may have been to rob Ahmed and that the murder occurred during the course of that felony offense.

¶77 The trial court found that (1) Stafford's testimony was relevant to the specific facts of the felony murder charge, (2) a jury could find the motive for the felony murder was robbery because Fuller was so desperate for money that he was earlier planning to commit a robbery for hire, and (3) the testimony was admissible. But the trial court failed to articulate on the record that it was persuaded that the robbery was actually planned[11] and failed to balance the probative value of Stafford's testimony against its prejudicial effect. *Fisher*, 165 Wn.2d at 745.

¶78 Here, the unfair prejudice of evidence that Fuller may have planned to commit an earlier robbery in 2009 significantly outweighs its probative value. Rather than establishing a motive for Fuller to rob Ahmed at knife point and commit felony murder, this evidence established that Fuller *may have considered* committing a robbery for hire in early 2009. But the record contains no evidence that Fuller

---

[11] It would not be a prior bad act for Fuller to have told Stafford that a robbery was planned. There would have to be evidence that Fuller acted on such a plan before it would be relevant and probative of a subsequent violent, late-night robbery. *Fisher*, 165 Wn.2d at 745.

committed that crime. Thus, this evidence was not evidence of a past *act*; rather, this was evidence that Fuller thought about committing a different type of crime against a different victim under different circumstances. Accordingly, this evidence was propensity evidence, used by the State to show that Fuller's earlier consideration of a robbery made it more likely that he intended to rob Ahmed.

### B. Propensity Evidence Was Not Harmless

¶79 An error in admitting evidence under ER 404(b) mandates reversal only if the error materially affected the outcome of the case within a reasonable probability. *State v. Everybodytalksabout*, 145 Wn.2d 456, 468-69, 39 P.3d 294 (2002). Conversely, such an error is harmless if the improperly admitted evidence is of little significance in light of the evidence as a whole.[12] *Everybodytalksabout*, 145 Wn.2d at 469.

¶80 The State alleged that Fuller killed Ahmed with premeditated intent or committed felony murder based on robbery or attempted robbery. Although the State's evidence circumstantially linked Fuller to the crime, it failed to present evidence of premeditation or of an actual robbery, even though most of the State's evidence related to felony murder based on robbery or attempted robbery.

¶81 For example, although the State introduced evidence that Fuller was unemployed in early 2009, in financial distress, pawning his belongings, being evicted from his apartment, and there was a one dollar bill on the floor of Ahmed's cab, there was no evidence that a robbery occurred as part of the crime. Because the focus of the State's case was on the robbery motive, there is a reasonable probability that Stafford's testimony affected the outcome of the trial. Accordingly, we hold that the trial court abused its discretion in admitting this testimony and that its admission was

---

[12] Although the court in *Everybodytalksabout*, 145 Wn.2d at 468-69, refers to "error" in admitting evidence under ER 404(b), we review admission of evidence under ER 404(b) for abuse of discretion. *Fisher*, 165 Wn.2d at 745.

not harmless. This provides an additional basis to reverse Fuller's conviction and remand for further proceedings.

## III. Double Jeopardy

¶82 Finally, Fuller argues that multiple convictions for the same offense violate double jeopardy, even when a trial court does not impose multiple sentences. Thus, Fuller argues that we must dismiss one of his two first degree murder convictions.

¶83 Although we reverse and remand for further proceedings on other grounds, we address this claim because Fuller could raise it if he were convicted on retrial. Under the facts in this case, we disagree with Fuller's claim that the trial court violated his right to be free from double jeopardy.

¶84 Double jeopardy violations are questions of law, which we review de novo. *State v. Womac*, 160 Wn.2d 643, 649-50, 160 P.3d 40 (2007). Both our federal and state constitutions prohibit " 'being (1) prosecuted a second time for the same offense after acquittal, (2) prosecuted a second time for the same offense after conviction, and (3) punished multiple times for the same offense.' " *State v. Turner*, 169 Wn.2d 448, 454, 238 P.3d 461 (2010) (quoting *State v. Linton*, 156 Wn.2d 777, 783, 132 P.3d 127 (2006)); U.S. Const. amend. V; Wash. Const. art. I, § 9. For purposes of double jeopardy, a conviction, even without an accompanying sentence, can constitute punishment. *Turner*, 169 Wn.2d at 454-55; *Womac*, 160 Wn.2d at 656-58. A trial court may violate a defendant's right to be free from double jeopardy if it enters multiple convictions for a single offense, even if it imposes only one sentence. *Womac*, 160 Wn.2d at 656-58.

¶85 Nonetheless, the State may charge and prosecute a defendant for alternative means of committing the

same crime.[13] *Womac*, 160 Wn.2d at 660 n.9. But where a jury finds a defendant guilty on the basis of more than one alternative means, the trial court may sentence the defendant for only one conviction. *State v. Trujillo*, 112 Wn. App. 390, 410-11, 49 P.3d 935 (2009). Thus, the trial court " 'should enter a judgment on the greater offense only and sentence the defendant on that charge *without reference to the verdict* on the lesser offense.' " *Turner*, 169 Wn.2d at 463 (quoting *Trujillo*, 112 Wn. App. at 411).

¶86 Where a jury finds a defendant guilty of multiple counts (or of alternative means of committing a single count) for the same offense, a trial court does not violate double jeopardy principles if it enters a judgment and sentence referring only to the greater charge. *Turner*, 169 Wn.2d at 462; *Womac*, 160 Wn.2d at 649; *State v. Ward*, 125 Wn. App. 138, 144, 104 P.3d 61 (2005). But a trial court is barred from *conditionally dismissing* a guilty verdict on a lesser charge because that would allow the State to reinstate the verdict on the lesser charge if the judgment on the greater charge were later overturned. *Turner*, 169 Wn.2d at 462; *see also Womac*, 160 Wn.2d at 658.

¶87 A court conditionally dismisses a guilty verdict if it holds that guilty verdict " 'in abeyance' lest the[ ] other convictions fail[ ] on appeal, declaring . . . that the [lesser] conviction retained validity." *Turner*, 169 Wn.2d at 463 (internal quotation marks omitted) (quoting *Womac*, 160 Wn.2d at 659). Thus, a trial court "may violate double jeopardy *either* by reducing to judgment both the greater and the lesser of two convictions for the same offense *or* by conditionally vacating the lesser conviction while directing, in some form or another, that the conviction nonetheless remains valid." *Turner*, 169 Wn.2d at 464. But a trial court does not violate double jeopardy if it merges multiple

---

[13] It is immaterial whether the State charges the defendant with one count, committed by alternate means, or with separate counts. *Womac*, 160 Wn.2d at 660 n.9.

convictions for the same offense into a single count. *State v. Meas*, 118 Wn. App. 297, 304-06, 75 P.3d 998 (2003).

¶88 Fuller argues that *Turner* requires a trial court to permanently dismiss all lesser or alternative guilty findings to comport with double jeopardy and that *Meas* is no longer good law. But Fuller misapprehends *Turner's* holding.

¶89 The *Turner* court explicitly held that a trial court does not violate double jeopardy if (1) it enters a judgment and sentence on only one conviction; (2) its judgment and sentence, including any appended order, does not include any reference to any lesser convictions; and (3) it does not reference any lesser convictions at sentencing. 169 Wn.2d at 464-65. Thus, it explicitly reconciled the *Womac* decision with our holding in *Trujillo*.

¶90 *Womac* held that the trial court violated double jeopardy when it entered judgment and sentence on three distinct counts that addressed the same crime and declared that the jury's guilty verdicts on the lesser counts were valid, even though it sentenced the defendant only on the greater count. 160 Wn.2d at 658-60. *Trujillo* held that the trial court did not violate double jeopardy when it did not reduce the jury's guilty verdicts on the lesser counts to judgment and did not mention those lesser counts at sentencing. 112 Wn. App. at 411. Although Fuller argues that *Womac* overruled *Meas*, neither *Turner* nor *Womac* is inconsistent with our holding in *Meas* that a sentencing court's merger of felony murder conviction with first degree murder conviction did not constitute a double jeopardy violation. *See* 118 Wn. App. at 304-05.

¶91 Here, Fuller requested that the sentencing court vacate one of his convictions for first degree murder. Instead, the sentencing court merged the convictions, finding that the State charged Fuller with first degree murder committed by alternate means. The sentencing court also merged both deadly weapon sentencing enhancements.

¶92 In doing so, the sentencing court recognized that double jeopardy principles prohibit Fuller from being convicted of two counts of first degree murder for killing Ahmed and explicitly ordered, "[I]n order to avoid any appearance that the defendant was convicted multiple times for [this] murder, Counts I and II shall be merged into a single count of murder in the first degree committed by alternative means, premeditated and felony." CP at 185. The sentencing court then entered a written judgment and sentence, stating that Fuller was convicted of one count of first degree murder. Accordingly, the sentencing court's order did not violate double jeopardy principles. *Meas*, 118 Wn. App. at 305-04.

¶93 Moreover, even if the sentencing court did not effectively merge both murder convictions, it did not violate double jeopardy guaranties under *Turner* and *Womac*. The sentencing court entered a judgment stating that Fuller was found guilty of one count of first degree murder and sentenced Fuller on only one count of first degree murder.[14] Although filed the same day as the judgment and sentence, the sentencing court did not append to the judgment the order merging the counts into a single conviction. The court's only reference to the multiple counts stated that

the Court, at this time, will deny the motion to vacate the convictions. I don't find that this is a double jeopardy [violation] under the current state of the case law. Mr. Fuller was convicted of a [single] homicide under two different theories.

The Court will grant the State's motion to merge Counts I and II, and we will proceed to sentencing.

RP (Apr. 12, 2010) at 5. Therefore, Fuller's double jeopardy argument fails.

---

[14] The standard range sentence for first degree murder was the same under each alternative charged.

¶94 We reverse Fuller's convictions and remand for further proceedings consistent with this opinion.

WORSWICK, C.J., and ARMSTRONG, J., concur.

Review denied at 176 Wn.2d 1006 (2013).