COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 NOV -3 AM 9: 07



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69707-2-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED IN PART OPINION |
| | ) | |
| DANIEL JAY PEREZ, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 3, 2014 |

SCHINDLER, J. — Daniel Jay Perez and David Hindal were inmates at the Monroe Correctional Complex. A jury convicted Perez of attempted second degree murder and assault in the second degree of Hindal. Perez seeks reversal, arguing the admission of Hindal's out-of-court testimonial statements violated his Sixth Amendment right to confrontation. Even if the statements were not testimonial, Perez asserts the court abused its discretion in admitting the statements as an excited utterance under ER 803(a)(2). Perez also claims the court erred by using a to-convict jury instruction for murder in the second degree, and the judgment and sentence erroneously refers to the vacated conviction for assault in the second degree. Viewed objectively, because the record shows the existence of an ongoing emergency, the initial statements made by Hindal to the corrections officers were not testimonial and did not violate the Sixth Amendment. Further, the court did not err in admitting the statements under ER

803(a)(2) or instructing the jury on murder in the second degree. Accordingly, we affirm. However, because the convictions for attempted second degree murder and assault in the second degree merged, we remand to amend the judgment and sentence and the order of commitment to remove any reference to the assault conviction.

## FACTS

In August 2009, Daniel Jay Perez and David Hindal were inmates housed in the D unit of the Special Offender Unit at the Monroe Correctional Complex. Approximately 30 to 33 inmates are housed in the D unit. The D unit has two "Dayrooms." A control booth with glass windows is located next to Dayroom 2. At the opposite end of Dayroom 2 is the inmate laundry room. There are two security surveillance cameras located in Dayroom 2 but no cameras in the laundry room.

On the morning of August 14, 2009, Sergeant Derek Walters and Officer Monte Walker were in the control booth. Officer James Misiano was monitoring the D unit, and Hindal and Perez were in Dayroom 2.

Hindal was the "laundry porter" for the D unit. Hindal was authorized to remain in Dayroom 2 while doing the laundry. At approximately 10:30 a.m., Sergeant Walters said he saw Hindal sitting in a chair in the entry to the laundry room reading a book.

> Hindal was kind of sitting in the threshold of the [laundry room] door, back facing me as I was looking in the dayroom. His eyes and his face was in the direction of the washing machine and the dryer.
> **Q.** His back was to you?
> **A.** His back was to me. He was reading a book.[1]

Meanwhile, Perez was pacing back and forth between the Dayroom 2 window facing the control booth and the far wall near the laundry room. Between 10:30 a.m.

---

[1] Emphasis in original.

and 10:40 a.m., inmates must return to their cells. The officers check each cell beginning at 10:50 a.m.

Officer Walker testified that at approximately 10:40 a.m., he opened the door to Dayroom 2 to let Perez return to his cell located on the second tier. Almost immediately thereafter, Officer Walker saw Hindal stagger out of the laundry room in obvious distress. Officer Walker said Hindal was "flapping his hands with something around his neck. . . . [I]t looked like some type of string or some type of long cord around his neck. . . . He was facing toward the booth, trying to get my attention." Officer Walker testified that he could not determine "whether it was self-harm or whether something had been done to him. I just saw that there was an issue with Hindal and he was acting sporadically, panicking and gasping for air." Officer Walker "immediately called an emergency code" for the "medical emergency." Sergeant Walters and Officer Misiano entered Dayroom 2 at 10:42 a.m. Within a few seconds, two other corrections officers entered the room.

Officer Misiano said Hindal was "staggering towards us, kind of swaying," his face was red, there was a "piece of sheet" around his neck, and there were red marks on his neck. Officer Misiano testified Hindal "[s]eemed to me like he was trying to talk, but he couldn't get any words out. . . . [H]e was pointing, trying to say something, but it was just he was gasping and we would just tell him to calm down." Officer Misiano said that when Hindal could speak, he said, " 'Perez,' " and pointed to the second tier jail cells.

Sergeant Walters testified that while Hindal continued to try and catch his breath, he said, " 'Should have checked my pulse. Should have checked my pulse.' " Sergeant

3

Walters and Officer Misiano told Hindal to sit down at one of the tables in Dayroom 2.

Sergeant Walters removed the rolled up sheet from around Hindal's neck.

Sergeant Walters testified that Hindal had "ligature marks in his neck. They were very

deep," and he also noticed deep ligature marks on Hindal's fingertips.

> It was like the ligature marks on [Hindal's] fingertips. He said he
> tried to pull the rope -- he called it a rope. But he said he was trying
> to do this and at one point he turned and he saw Perez. He was
> fighting and then he said that he acted like he was sleeping. That's
> kind of what I saw.
> **Q.**    When you say marks on his fingers, are you talking about
> indentations?
> **A.**    Yes.[2]

At 10:43 a.m., Officer Misiano left Dayroom 2 with the two other corrections

officers. Sergeant Walters remained with Hindal. Approximately 30 seconds later, the

medical response team arrived. Sergeant Walters then contacted Lieutenant Wise to

report Hindal was "allegedly assaulted by Perez." Lieutenant Wise ordered the facility

locked down.

After the medical team treated Hindal, Sergeant Walters moved him to Dayroom

1 and secured Dayroom 2 as a crime scene. Sergeant Walters then gave Hindal a

pencil and paper and asked him to "write a detailed statement of what had occurred."

The State charged Perez with attempted murder in the second degree in violation

of RCW 9A.28.020 and RCW 9A.32.050(1)(a) and assault in the second degree by

strangulation in violation of RCW 9A.36.021(1)(g). Perez entered a plea of not guilty.

The court scheduled a trial date for October 3, 2012.

In September 2012, Hindal was being held in the King County jail pending trial on

a burglary charge. Sometime in late September, Hindal contacted the deputy

---

[2] Emphasis in original.

4

prosecutor to " 'get a better deal.' " When the prosecutor " 'declined to extend any sort of assistance,' " Hindal stated he was " 'not interested in testifying' " against Perez.

The court held a hearing to determine whether Hindal would testify at trial. During the pretrial hearing on October 1, Hindal testified that he would not answer questions under oath at trial. Instead, Hindal "would ask the jury to acquit Mr. Perez" because "he's not guilty as far as I'm concerned. I don't consider myself a victim . . . and I say that there's no crime."[3] The court recessed to obtain appointed counsel for Hindal.

When the hearing resumed, Hindal testified that he would not testify against Perez because he suffers from an "obsessive-compulsive disorder" that makes him "feel that there's an entity that stalks me and will actually bring harm to my family if I do so." The court ruled Hindal was a material witness and "in contempt of court for willfully refusing to answer." The court ordered Hindal "held in the Snohomish County jail in contempt until he agrees to answer."

---

[3] [PROSECUTOR:] . . . [I]f I ask you questions under oath on the stand, are you going to answer them?

[HINDAL:] Probably not.

[PROSECUTOR:] What does that mean?

[HINDAL:] Okay, not.

[PROSECUTOR:] Okay. So, I would ask you questions about what happened on --

[HINDAL:] And you would probably -- the Court would probably find me in contempt, yes.

[PROSECUTOR:] So, you're just not going to respond?

[HINDAL:] Actually, I would ask the jury to acquit Mr. Perez. I would. I've got a letter that I was trying to get to you guys, but it obviously didn't work. So, I mean, do you really want me here? I mean --

[PROSECUTOR:] Okay. You're saying he's not guilty?

[HINDAL:] Yes, I'm saying that. Well, I'm saying he's not guilty as far as I'm concerned. I don't consider myself a victim. I mean, if I'm the alleged victim in this case and I say that there's no crime, I mean, the State can go forward with it, but, I mean, isn't it kind of presumptuous for -- .

5

On October 3, the court held a lengthy pretrial hearing to determine whether the out-of-court statements Hindal made to Officer Misiano and Sergeant Walters were admissible. Officer Walker, Officer Misiano, Sergeant Walters, and a medical emergency response team nurse testified at the pretrial hearing. The State also introduced into evidence surveillance video from the two security cameras in Dayroom 2.

Officer Misiano testified that he arrived at Dayroom 2 within 5 to 10 seconds after hearing the emergency call on the radio. Officer Misiano said Hindal was "staggering towards us, kind of swaying," with "bloodshot face, eyes real, real red" and "trying to talk, but he couldn't get any words out. . . . [H]e was gasping."

Sergeant Walters testified that when he entered Dayroom 2, Hindal "was in distress," his "eyes were bloodshot and he couldn't really speak, couldn't get anything out. We were asking him what happened, what's wrong, what's wrong, and he couldn't really get anything out."

> [Hindal] was in distress. He couldn't speak. He was very red. His face was very red. As we approached Hindal, you could see his eyes were bloodshot and he couldn't really speak, couldn't get anything out. We were asking him what happened, what's wrong, what's wrong, and he couldn't really get anything out.
>
> Q. Did it appear he was trying to speak?
> A. He was *trying*.[4]

Sergeant Walters testified that after catching his breath, Hindal said, " 'He tried to kill me. He tried to kill me.' " When Sergeant Walters asked who, Hindal said, " 'Perez.' "

> Q. How much of this -- where is [Hindal] positioned during this conversation? So, this initial part where he's saying he tried to kill me, Perez, is he still standing up and trying to get his breath at that

---

[4] Emphasis in original.

6

point?

**A.** He is, and then we were able to get him to sit down at one of the dayroom tables.[5]

Sergeant Walters described the emergency medical response procedure. Sergeant Walters testified that the initial response focuses on getting medical assistance and evaluating the situation.

So we went in and isolate and contain, shut things down, and then you want to evaluate and plan. So we're trying to evaluate what it is that we had. The initial Phase I response for the quick response team, we were requesting R and Ms, which are our phase responders, and medical.

Sergeant Walters also explained that "[o]nce we found out that we had a possible assault, we summoned a Phase II response and locked all the units down." Sergeant Walters testified that a lockdown is ordered because "[w]e don't know the extent and we're going to need to summon all available resources," and there might be multiple inmates involved in an assault "[t]hat could still act."

Nurse Shana Cantoni testified that she responded to Dayroom 2 as part of the emergency medical team. Cantoni said Hindal had petechiae or redness on his face and in his eyes and "a line around his neck that looked bloody." Cantoni testified that one of the other nurses checked Hindal's vital signs and gave him oxygen, "just to make him feel more comfortable because he was experiencing a lot of anxiety." While the medical team was treating Hindal, "[h]e was saying that he had been strangled" and that Perez did it.

The Dayroom 2 video surveillance shows Perez pacing back and forth between the window facing the control booth and the far wall near the laundry room entrance. At 10:34 a.m., Perez pulls out a rolled up length of sheet from his waistband. The video

---

[5] Emphasis in original.

shows Perez hold each end of the sheet in his hands and wrap the length of the sheet around his wrists. Perez pulls the length of sheet taut between his hands while he walks into the laundry room. Less than a second later, a book falls onto the floor in the threshold of the laundry room doorway.

At 10:40 a.m., Perez walks out of the laundry room. As he walks to exit Dayroom 2, Perez is swinging his arms and his hands are empty. At 10:41 a.m., Hindal staggers into view and stumbles toward the window facing the control booth, waving his arms over his head. A rolled up length of sheet is wrapped around his neck.

At 10:42 a.m., Sergeant Walters and Officer Misiano enter Dayroom 2 and approach Hindal. Hindal is still waving his arms. Within a few seconds, two additional officers enter the room. While Hindal sits down at one of the tables in the room, he is clearly in distress, repeatedly putting his head down on his arms. Sergeant Walters unwraps the rolled up sheet from Hindal's neck. At 10:43 a.m., Officer Misiano and the two other corrections officers leave Dayroom 2. Sergeant Walters remains standing next to Hindal. The medical team and several other corrections officers arrive with a wheelchair approximately 30 seconds later. As the medical team walks in, Hindal makes a choking motion with his hands, which he repeats a few seconds later. Hindal points toward one wall of Dayroom 2. The video ends at 10:45 a.m. as the medical personnel are treating Hindal.

The court ruled that the initial out-of-court statements Hindal made to Officer Misiano and Sergeant Walters were not testimonial. The court found Hindal made the statements within minutes of the attack and the circumstances objectively established

an ongoing emergency.

> Looking at the factors, were the events occurring at the time the statement is made. The events were not occurring but very little time had elapsed. It appeared to be within one to at most two minutes of Hindal walking into the room in a distressed state that the first statement is made. These statements begin and go for maybe a couple minutes thereafter, however they are regarding a past event. . . .
>
> The second factor is would a reasonable listener believe the information was required to deal with an ongoing emergency, are we looking at a bona fide call for help here. Here we have a situation where at the moment -- it's one thing to look back at this in hindsight and say, well, it wasn't very emergent at the time. However, as the guards are entering the room, they don't know what's going on. We do now know and can look back, but at the moment at that time they've got somebody who's gone from fine one minute to appearing to be seriously injured and unable to talk, stumbling around with obvious injuries the next minute.
>
> So they've got injuries, medical state to deal with for which they need to know what happened. Secondly, they don't know -- I think we have to take into account we are in the special offender unit and they don't know if this is self-inflicted or inflicted by another inmate, a guard, or what it is. And there is a need to determine who or how it occurred to protect potentially guards and other inmates as well as Mr. Hindal under the circumstances to figure out how he got into the injured state.

The court concluded the emergency was particularly acute because "[t]hey've got the situation where these people are all living together. They need to know if there's -- its not just for Perez getting into Hindal, it's the potential that Perez may be dangerous and hurt a guard, hurt another inmate and may need to be moved."

The court ruled that the primary purpose of the initial questions and answers was to resolve the emergency.

> So I believe that there was a need at that time, maybe not in hindsight but at that time not knowing to know more about exactly what was going on to figure out if there was an emergency and what needed to be done about it. The fact that at that point no one could come in and get Hindal because the door was locked is not the only circumstance that these officials have to deal with. They've got the situation where these people are all living together. They need to know if there's -- it's not just for Perez getting into Hindal, it's the potential that Perez may be dangerous and hurt a guard, hurt another inmate and may need to be

9

moved. And in addition, if Hindal's statement was some bogus statement by a mentally ill offender after he's injured himself, there was a need to figure that out, to figure out if they needed to keep him safe from himself, from a suicide. So they really did have to know a little more than somebody pointing and saying "Perez" to deal with the potential emergency and the injuries that they were facing.

The court also concluded the initial questions and answers did not constitute formal interrogation.

And finally, there's the formality or informality of the interrogation. In that regard, clearly we're not in any kind of formal interrogation. Really initially they're just like, what's happened to you, in response to seeing his injuries. We're not at a situation where one interrogation person is sitting down and asking for an ongoing story. We have a situation where a person has made a cry for distress, someone comes up and says what happens and then they blurt out what happened. And we have, as you can see on the video, a whole bunch of people running all around. Nobody seems to be taking down notes, no one is asked to have them make a statement. So it's not a formal interrogation, it's more initial cry for help, come to the scene, figure out what the emergency is enough to deal with it.

Now, thereafter they move him, segregate him out to a different room and give him sheets of paper. And I imagine after that we did have formal interrogation, but this is clearly not a formal interrogation at this point in the first two to six minutes following Hindal's cry for assistance, or I don't know if we want to say cry, waving his arms for assistance.

The court also ruled the initial statements Hindal made were admissible at trial under ER 803(a)(2) as an excited utterance.

I do find that the statements related to a startling event or condition. The statements were the speaker's statements about having allegedly been assaulted and allegedly having had an attempt against his life by being strangled immediately after the events allegedly occurred. This does qualify as a startling event and that the injuries are a startling condition.
. . . .
These initial statements occurred while the declarant was still under the stress of the excitement caused by the event or condition. And I base that on the testimony, but also you can see that in part from the video that was put into evidence. These initial statements in the first dayroom, which was Dayroom Number 2 is its number on the room, all apparently appear to have occurred within about six minutes, right after the alleged attempted murder.

10

A number of witnesses testified at trial, including Officer Walker, Officer Misiano, Sergeant Walters, and Shana Cantoni. The defense theory at trial was that Hindal caused his own injuries in an attempt to either harm himself or obtain prescription medication. The court admitted into evidence photographs of Hindal's injuries and the surveillance video from the two security cameras in Dayroom 2. The State played the surveillance video for the jury during the trial and during closing argument.[6]

Officer Misiano testified that when Sergeant Walters asked Hindal, "[W]hat's going on here," Hindal responded, "Perez, Perez." Officer Misiano testified that Hindal "was gasping for air but he was saying Perez, Perez," and "pointing . . . towards Tier 2."

Sergeant Walters testified that after he asked Hindal, "[W]hat's wrong, what's wrong," Hindal said Perez attacked him from behind and tried to kill him. Sergeant Walters testified, in pertinent part:

> When I entered the dayroom [Hindal] was kind of panicking, he was in distress. I was like, what's wrong, what's wrong? He started talking, "He tried to kill me." But I noticed that he had a yellow cloth that was wrapped around his neck and kind of hanging on him.
>
> . . . .
> Q. Was he saying anything to you?
> A. He was trying to. It took him a little bit to kind of get his breath, and he kept saying, "He tried to kill me, he tried to kill me." I'm trying to calm him down, and he says, "Perez." I said, "Who tried to kill you?" And he said, "Perez."
>
> . . . .
> . . . He said that [Perez] attacked him from behind. He said that it was like a dream. He said he felt a rope go around his neck, and he was able to turn and face Perez, and he tried to fight him. He said that he tried to pull the rope, he describes it as a rope, from his neck, and he said he was throwing punches. And he went into talking about how he -- I don't know, he described something like -- he was rambling on a lot of stuff, there was just a lot of stuff he was

---

[6] The court also allowed the jurors to play the video during deliberations.

saying. But he described that he acted like he was dead and he didn't check a pulse.

Q. Who was he saying didn't check the pulse?

A. Perez.

On cross-examination, Sergeant Walters testified that self-harm is a major prison infraction and penalties can include being put in segregation or loss of "good time."

Shana Cantoni testified the "red blotches" on Hindal's cheeks were caused by the obstruction of blood flow. Cantoni testified that Hindal told her "he had been strangled by Daniel Perez," and that the marks around his neck "were . . . consistent with that."

> [W]hen I assessed [Hindal], I saw the mark on his neck and his general level of distress and I had inferred that what had happened was that the blood flow had been obstructed around his neck and was unable to return to his heart and, therefore, had resulted in this phenomena that occurs where the blood -- essentially the blood cells leak out of the capillaries and leave a splotchy looking rash.

On cross-examination, Cantoni testified that the redness in Hindal's face and eyes could have been caused by self-asphyxiation. Cantoni also testified that she prescribed Valium for Hindal.

During the defense case, the court admitted into evidence a portion of the verbatim transcript of Hindal's testimony during the pretrial hearing. Sergeant Ronald Packwood testified that a medical examination of Perez was conducted and there were no injuries to his face or body.

During closing argument, the State relied heavily on the two security surveillance videos to argue Perez was guilty of attempted murder in the second degree.

> [Perez] had to have the weapon ready as he entered the room, and that of course is on the video. . . . I'll direct your attention again to State's [Exhibit] 4. And we're at 10:39 in the morning and 39 seconds. This is when the Defendant is going to attempt his murder. He's started to pull it out of his

12

waistband. We see it displayed right here, (Indicating.) getting it wrapped around his hands so that when he attacks Mr. Hindal from behind, he can try to minimize the possibility of Hindal fighting back. Get it around his neck fast, pull hard. You saw the photographs. It was serious. He had cut through Mr. Hindal's skin with it. And of course right here we see the book that Mr. Hindal was reading, so he must have had his back -- and as he gets the ligature around his neck, the book flies backwards right into the entryway. Very calculated.

The defense argued that if Hindal admitted to trying to injure himself, "a major prison infraction," he was "going to be penalized, . . . going to potentially lose good time and spend longer in prison, . . . going to potentially be locked up in segregation." But if Hindal claimed he was the victim of an assault, he would "get absolutely no sanctions," and could get "perks" such as prescription medications. The defense attorney pointed to the "minor injuries" suffered by Hindal and the evidence that Perez had no injuries to his hands or body. The defense attorney also pointed to Hindal's testimony that Perez was not guilty and he did not consider himself a victim.

The jury convicted Perez of attempted murder in the second degree and assault in the second degree. At sentencing, the State agreed the conviction for assault in the second degree merged with the conviction for attempted murder in the second degree. The court sentenced Perez to 285 months confinement with 36 months of community custody for attempted murder in the second degree.

## ANALYSIS

Confrontation Clause

Perez contends the court erred in admitting Hindal's out-of-court statements in violation of his Sixth Amendment right to confrontation. U.S. CONST. amend. VI.[7] The

---

[7] The Sixth Amendment was incorporated and made applicable to the states through the due process clause of the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); U.S. CONST. amend. VI; U.S. CONST. amend. XIV.

Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). We review alleged violations of the confrontation clause de novo. State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009).

While the Court in Crawford did not provide a "precise articulation" or comprehensive definition of testimonial hearsay for purposes of the confrontation clause, the Court defined "testimony" as " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " Crawford, 541 U.S. at 51-52 (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). The Court held that testimonial hearsay for purposes of the confrontation clause applies at a minimum to (1) ex parte testimony at a preliminary hearing and (2) "[s]tatements taken by police officers in the course of interrogations." Crawford, 541 U.S. at 51-52.

In Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the Court held that where the objective circumstances show "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," the statements to police are not testimonial. The Court explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the

primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822.

In Davis, the Court held the statements made by the victim of domestic violence during a 911 call in the midst of the attack were not "testimonial." Davis, 547 U.S. at 827-29. The Court concluded the primary purpose of the statements "was to enable police assistance to meet an ongoing emergency," rather than simply to collect facts to identify a perpetrator and further a prosecution. Davis, 547 U.S. at 827-29. However, the Court concluded that after the perpetrator left and the 911 operator continued to "pose a battery of questions[,] . . . from that point on, [the victim]'s statements were testimonial." Davis, 547 U.S. at 828-29.

The Court explained that the existence of an ongoing emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822. An ongoing emergency focuses the participants on "end[ing] a threatening situation." Davis, 547 U.S. at 832.

In Michigan v. Bryant, ___ U.S. ___, 131 S. Ct. 1143, 1150-67, 179 L. Ed. 2d 93 (2011), the Supreme Court considered whether the victim's statements to police officers violated the confrontation clause. In Bryant, police officers found the victim lying on the ground next to his car at a gas station, mortally shot in the abdomen. The officers asked the victim what happened and who shot him. The victim identified the defendant and said the shooting had occurred about 25 minutes earlier. Bryant, 131 S. Ct. at 1150.

The Court held the primary purpose of the interrogation was to enable law enforcement to meet an ongoing emergency. Bryant, 131 S. Ct. at 1166. "[T]he

15

existence of an 'ongoing emergency' at the time of an encounter between an individual and the police is among the most important circumstances informing the 'primary purpose' of an interrogation." Bryant, 131 S. Ct. at 1157. "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." Bryant, 131 S. Ct. at 1158. But the Court notes that the interaction with the police can evolve from " 'an interrogation to determine the need for emergency assistance' " into testimonial statements "if a perpetrator is disarmed, surrenders, is apprehended, or as in Davis, flees with little prospect of posing a threat to the public." Bryant, 131 S. Ct. at 1159 (quoting Davis, 547 U.S. at 828).

The Court held that in order to determine whether the primary purpose of police questioning is to enable police assistance to meet on ongoing emergency, a court must objectively evaluate the circumstances from the perspective of the parties at the time and "not with the benefit of hindsight." Bryant, 131 S. Ct. at 1156-57.[8] "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Bryant, 131 S. Ct. at 1156.

> An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs—e.g., at or near the scene of

---

[8]      The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause. The emergency is relevant to the "primary purpose of the interrogation" because of the effect it has on the parties' purpose, not because of its actual existence.

Bryant, 131 S. Ct. at 1157 n.8 (quoting Davis, 547 U.S. at 822).

the crime versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated.

Bryant, 131 S. Ct. at 1156 (quoting Davis, 547 U.S. at 822).

Our inquiry is also guided by (1) whether the speaker was speaking about past events or current ones as they were occurring, requiring police assistance; (2) whether a reasonable listener would conclude that the speaker was facing an ongoing emergency; (3) the nature of the information elicited by police; and (4) the formality of the interrogation. Koslowski, 166 Wn.2d at 418-19 (citing Davis, 547 U.S. at 827).

Perez asserts the initial statements Hindal made to Sergeant Walters and Officer Misiano were testimonial because Perez had left Dayroom 2, Hindal was secure, and the emergency had been resolved. Viewed objectively, the record does not support his assertion.

The initial statements Hindal made to Sergeant Walters and Officer Misiano were related to events that occurred just minutes earlier. Where statements are made "within minutes of the assault," such statements may properly be considered as "contemporaneous[ ] with the events described." State v. Ohlson, 162 Wn.2d 1, 17, 168 P.3d 1273 (2007). Further, "it is not inconsistent to speak of past events in conjunction with an ongoing emergency and, in appropriate circumstances, considering all of the factors the Court identified [in Davis], the fact that some statements are made with regard to recent past events does not cast them in testimonial stone." Koslowski, 166 Wn.2d at 423 n.8.

As to the second and third factors, Officer Misiano and Sergeant Walters went into Dayroom 2 in response to a medical emergency. Hindal had a bloody strip of sheet

around his neck and was in obvious distress, "flapping his arms," "panicking and gasping for air." Officer Misiano and Sergeant Walters did not know whether Hindal's injuries were self-inflicted or inflicted by someone else, and there was an immediate need to determine what had occurred. Further, the fact that Perez was no longer in Dayroom 2 did not mean the emergency had been resolved. The record establishes not only a medical emergency but also concerns for the safety of other inmates and corrections officers. See Bryant, 131 S. Ct. at 1158 ("An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue."). The nature of what was asked and answered was necessary to resolve the ongoing emergency and help identify and assess the threat posed by Perez.

The record also establishes a lack of formality. The interaction in Dayroom 2 between Officer Misiano, Sergeant Walters, and Hindal lasts approximately three minutes. The video shows Sergeant Walters and Officer Misiano entering Dayroom 2 at 10:42 a.m., and the video concludes at 10:45 a.m. As Sergeant Walters is asking Hindal questions and trying to calm him down, corrections officers are coming in and out of the room and medical personnel arrive to assess Hindal's injuries. It is clear from the video and the testimony that the circumstances were chaotic and disorganized. See Bryant, 131 S. Ct. at 1160 (contrasting the lack of formality "in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion," with the "formal station-house interrogation in Crawford").

An objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties" demonstrates that the primary purpose of the questioning by Sergeant Walters was to respond to an ongoing medical emergency, determine whether Hindal injured himself or whether he was attacked by another person, and assess the risk of harm to other inmates and corrections officers. Bryant, 131 S. Ct. at 1156. The initial statements Hindal made to Officer Misiano and Sergeant Walters fall squarely under the ongoing emergency exception.

ER 803(a)(2)

Perez contends that even if Hindal's statements were not testimonial, the court erred in admitting the statements as an excited utterance under ER 803(a)(2). Perez argues the record does not show Hindal was under the stress of excitement of a startling event. We disagree.

We review a trial court's decision to admit a hearsay statement as an excited utterance for abuse of discretion. Ohlson, 162 Wn.2d at 7-8. We will not reverse the trial court's decision "unless we believe that no reasonable judge would have made the same ruling." State v. Woods, 143 Wn.2d 561, 595-96, 23 P.3d 1046 (2001).

ER 803(a)(2) provides that a statement is not excluded as hearsay if it is an excited utterance "related to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

The proponent of excited utterance evidence must satisfy three "closely connected requirements:" (1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition. Woods, 143

Wn.2d at 597; State v. Young, 160 Wn.2d 799, 806, 161 P.3d 967 (2007).

The critical determination is " 'whether the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.' " State v. Strauss, 119 Wn.2d 401, 416, 832 P.2d 78 (1992)[9] (quoting Johnston v. Ohls, 76 Wn.2d 398, 406, 457 P.2d 194 (1969)).

The trial court ruled that when Hindal made the statements "right after the alleged attempted murder," he was under the stress of excitement of a startling event or condition.

> [O]n the video you can see that [Hindal is] stumbling around, waiving his arms kind of wildly. We have testimony from witnesses that his face was really red, his eyes were red, it was a deep red line or mark around the neck. There was the alleged attempted murder weapon, a string or cloth was still wrapped around the neck. You can see that actually being taken off of his neck during the course of -- in the video during the course of this five minutes or so they remained in this Dayroom Number 2.
> There's testimony that initially he's trying to speak but he actually physically is incapable of speaking, and from inference it's due to the injuries that he suffered. He finally is able to get out alive after having difficultly speaking, which is either "Perez" or "Perez tried to strangle me," or words to that effect.
> It's not -- well, contrary to what some of the testimony is, there isn't a long period of time where he's standing up talking and then goes and sits down. He initially right when the guards all come in he sits down. That's clear from the video. It doesn't appear that we have some questioning, a stop and then some more questioning. What it appeared to me from the testimony as well as a little bit from the video is he blurts out "Perez" and then he starts to blurt out what's just happened to him in greater detail.
>     . . . .
> So I am finding that these . . . are admissible under the excited utterance exception to the hearsay rule.

The court did not abuse its discretion in finding that when Hindal made his initial statements to Officer Misiano and Sergeant Walters, he was under the stress of a

---

[9] Alteration in original.

startling event. The attempted murder occurred between 10:34 a.m., when Perez walked into the laundry room, and 10:40 a.m., when Perez walked out of the laundry room. Less than a minute later, Hindal emerged from the laundry room, signaling for help and gasping for breath. When Officer Misiano and Sergeant Walters entered Dayroom 2, Hindal was struggling to breathe and obviously injured. The initial statements Hindal made while in Dayroom 2 were made while still under the stress of a startling event. The court did not abuse its discretion in admitting the statements under ER 803(a)(2).

Because the remainder of this opinion has no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

Jury Instructions

Perez argues the court erred by instructing the jury with a to-convict instruction for murder in the second degree. Perez contends the to-convict instruction was misleading, confusing, and diminished the State's burden.

We review a challenge to a jury instruction de novo, evaluating the jury instruction "in the context of the instructions as a whole." State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). " 'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.' " Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002) (quoting Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)). If a jury instruction correctly states the law, the trial court's decision to give the instruction will not be disturbed absent an abuse of discretion. State v. Aguirre, 168 Wn.2d 350, 364, 229 P.3d 669 (2010).

The State proposed a set of jury instructions that complied with WASHINGTON

PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC). "Jury

Instruction" 8 defined the elements of attempted murder in the second degree according

to WPIC 100.02, and Jury Instruction 10 defined the elements of murder in the second

degree according to WPIC 27.02. 11A WPIC 100.02, at 386 (3d ed. 2008); 11 WPIC

27.02, at 377 (3d ed. 2008).

Jury Instruction 8 states:

> To convict the defendant of the crime of attempted Murder in the Second Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about the 14th day of August, 2009, the defendant did an act that was a substantial step toward the commission of Murder in the Second Degree;
> (2) That the act was done with the intent to commit Murder in the Second Degree; and
> (3) That the act occurred in [the] State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.[10]

---

[10] 11A WPIC 100.02 states:

Attempt—Elements

To convict the defendant of the crime of attempted (fill in crime), each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about (date), the defendant did an act that was a substantial step toward the commission of (fill in crime);
(2) That the act was done with the intent to commit (fill in crime); and
(3) That the act occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

(Boldface omitted).

Jury Instruction 10 states:

> To convict the defendant of the crime of murder in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 14th day of August, 2009, the defendant acted with intent to cause the death of David Hindal;
>
> (2) That David Hindal died as a result of defendant's acts; and
>
> (3) That any of these acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.[11]

Perez proposed a modified version for Jury Instruction 10, the definition of "murder in the second degree." The defense proposed instruction omitted the to-convict language and the last two paragraphs of the WPIC pattern jury instruction.[12] Perez argued the jury might "get confused with regards to which instruction that they're supposed to be following."

---

[11] 11 WPIC 27.02 states:

Murder—Second Degree—Intentional—Elements

To convict the defendant of the crime of murder in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about (date), the defendant acted with intent to cause the death of (name of person);

(2) That (name of decedent) died as a result of defendant's acts; and

(3) That any of these acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

(Boldface omitted.)

[12] 11 WPIC 27.02. The proposed jury instruction states:

The elements of the crime of murder in the second degree that must be proved beyond a reasonable doubt are:

(1) That on or about the 14th day of August, 2009, the defendant acted with intent to cause the death of David Hindal;

(2) That David Hindal died as a result of defendant's acts; and

(3) That any of these acts occurred in the State of Washington.

23

The court decided to instruct the jury using the State's proposed jury instructions because "[i]t's what is recommended in the comments to the WPIC." The court also found it unlikely that Jury Instruction 10 would cause confusion because the instructions as a whole and the verdict form clearly stated the charged crime was attempted murder in the second degree, not murder in the second degree. The court also noted there was no dispute that Hindal survived the attack.

Considered as a whole, we conclude the jury instructions correctly informed the jury of the elements of attempted murder in the second degree. The note on use of WPIC 100.02 specifically states, "If the basic charge is an attempt to commit a crime, a separate elements instruction must be given delineating the elements of that crime." 11A WPIC 100.02 note on use at 386. The instructions accurately defined "attempt" and the elements of the attempted offense of murder in the second degree. While Jury Instruction 10 defining the elements of murder in the second degree included to-convict language, the instructions make clear the charged crime was attempted murder in the second degree and the State bears the burden of proving every essential element of the crime of attempted murder in the second degree beyond a reasonable doubt.

Perez also argues a jury inquiry shows the instructions were misleading, and argues the court erred in answering a jury inquiry by failing to provide an additional definitional instruction. The record does not support his argument. During deliberations, the jury submitted an inquiry to the court, stating, "Can we have the definition of murder in the second degree?" The court did not err in directing the jury to "[r]efer to Instruction #10."

Judgment and Sentence

Perez asserts the trial court violated double jeopardy by referring to the assault conviction in the judgment and sentence and order of commitment.

Double jeopardy is a question of law that we review de novo. State v. Womac, 160 Wn.2d 643, 649-50, 160 P.3d 40 (2007). The double jeopardy clause of our constitution "prohibits imposition of multiple punishments for the same criminal conduct." State v. Turner, 169 Wn.2d 448, 465-66, 238 P.3d 461 (2010); WASH. CONST. art. I, § 9. The term "punishment" encompasses a conviction without an accompanying sentence. Turner, 169 Wn.2d at 454-55.

> To assure that double jeopardy proscriptions are carefully observed, a judgment and sentence must not include any reference to the vacated conviction—nor may an order appended thereto include such a reference; similarly no reference should be made to the vacated conviction at sentencing.

Turner, 169 Wn.2d at 464-65.

At sentencing, the State conceded that the "conviction for 2 [degree] Assault merges with [Perez's] conviction for the greater offense of Attempted 2 [degree] Murder. Thus, the 2 [degree] Assault conviction does not count as a current offense for scoring purposes." On appeal, the State relies on State v. Fuller, 169 Wn. App. 797, 282 P.3d 126 (2012), to argue that "the judgment and sentence does not require correction." Fuller does not support the State's argument.

In Fuller, the judgment and sentence did not refer to the merged conviction. Fuller, 169 Wn. App. at 835. By contrast, here, the "FINDINGS" section on page one of the judgment and sentence state the jury found Perez "guilty" of both crimes, but there is a line drawn through "Count II[,] Second Degree Assault," with the notation—

"Merged." Likewise, the court notes on page two of the judgment and sentence that "Counts I and II Merge." The "SENTENCING DATA" section refers to Count II but crosses out the offender score, standard range, and maximum term information for Count II, noting, "Merged with Count I." The "SENTENCE AND ORDER" section of the judgment and sentence also shows the court sentenced Perez only on Count I for attempted murder in the second degree. Further, the order of commitment attached to the judgment and sentence states that Perez was convicted on both counts and that "judgment has been pronounced against him/her that he/she be punished therefore by imprisonment." We hold the court erred in referring to the conviction of assault in the second degree in the judgment and sentence and the order of commitment.

We affirm the conviction for attempted murder in the second degree but remand to amend the judgment and sentence and the order of commitment to delete any reference to the merged conviction for assault in the second degree.

WE CONCUR:

_Schindler, J._

_Cox, J._

_Lau, J._

26