# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59027-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| LAWRENCE E. BALANDRAN, JR., | |
| Appellant. | |

CHE, J. — Lawrence Balandran appeals his convictions for second degree incest and fourth degree assault (domestic violence) with sexual motivation.

At both of Balandran's trials, the trial court gave a "no corroboration" jury instruction, which stated that in order to convict Balandran of incest, "it is not necessary that the testimony of the alleged victim be corroborated." The trial court allowed testimony that Balandran strangled his ex-partner and that he previously sexually assaulted his daughter, BB.

Balandran argues that we should reverse his convictions because the no corroboration instructions lessened the State's burden of proof and misled the jury, the trial court impermissibly commented on the evidence by giving the instructions, and the trial court erroneously admitted irrelevant and inflammatory propensity evidence. Balandran also argues that, at minimum, we should reverse several community custody conditions because some are not crime related and one is unconstitutional.

We hold that the no corroboration jury instructions were constitutionally adequate; that the no corroboration instructions were not a comment on the evidence; that any alleged error in admitting the challenged testimony at the first trial was harmless; and that Balandran's objection to BB's testimony at the second trial was insufficient to preserve the issue for appeal. In addition, we hold that the trial court abused its discretion by imposing community custody conditions prohibiting Balandran from contact with all minors and possessing or using any electronic device capable of accessing the Internet without prior approval, but that the trial court lawfully imposed community corrections officer (CCO) directed urinalysis and breathalyzer testing.

Accordingly, we reverse the condition prohibiting Balandran from possessing or using any electronic device capable of accessing the Internet without prior approval and remand for the trial court to strike or modify this condition. We also reverse the condition prohibiting Balandran's contact with all minors and remand to the trial court with instructions to address, on the record, whether to impose the condition, taking into consideration Balandran's constitutional right to parent, the necessity of a provision prohibiting contact with all minors, and any viable, less restrictive alternatives that may exist. We affirm the condition requiring CCO-directed urinalysis and breathalyzer testing.

FACTS

BACKGROUND

Balandran had three children, including BB, with his ex-partner. Balandran and his ex-partner had a "rocky" relationship. Rep. of Proc. (RP) at 743. The two split up in October 2020.

2

Balandran also had a "rocky" relationship with his teenage daughter, BB. RP at 741. The two argued often, and their arguments involved yelling, "hitting, sometimes slapping, or throwing things." RP at 743.

In December 2020, Balandran took his children to a playground. BB wanted to leave, told Balandran she was going to call her mother, and then started to walk toward her home. Balandran told his children, including BB, to get into the car, and when they got into his car, he drove away from the park. BB again told Balandran she was going to call her mother to pick her up, at which point Balandran threw BB's phone out the window, upsetting BB.

Balandran then drove his children to his mother's house. Balandran's mother, heard BB and Balandran fighting outside her home. BB wanted to leave, wanted her mother, was crying, and tried to walk away from her grandmother's home. After her grandmother assured BB she should take BB to her mother, BB, her siblings, and Balandran eventually entered the grandmother's home. BB then looked at Balandran and stated, "[Y]ou know what you did to me when I was sleeping." RP at 258. The grandmother asked Balandran what he did to BB. Balandran said, "Nothing," became angry, left his mother's home, and drove away. RP at 258. Before the grandmother drove the children back to their home, she advised BB to tell her mother about the incident between her and Balandran.

BB did not tell her mother about the incident until around New Year's Eve while on a family trip. During the trip, Balandran and his ex-partner fought in their hotel room, and BB told Balandran to stop fighting or BB would "tell her [mom]." RP at 331. Balandran "jumped off of [his ex-partner]" and "whisper[ed] to [BB] . . . not to tell . . . to be quiet." RP at 331. Balandran

then repeatedly said he was "not a weirdo" and would not tell his ex-partner what BB was talking about. RP at 331.

While Balandran showered, BB was crying and told her mother that on the morning of November 23, 2020, Balandran touched her vagina. BB's mother did not report this incident to the police until January 22, 2021.

The State charged Balandran with second degree incest, fourth degree assault (domestic violence) with sexual motivation, and indecent liberties.

## MOTIONS IN LIMINE

Balandran moved in limine to exclude "all evidence of prior bad acts," specifically, domestic violence allegations, claims, and convictions between Balandran and his ex-partner and/or BB, and that a no-contact order existed between Balandran and his ex-partner. Clerk's Papers (CP) at 18. The State indicated it would not seek to admit domestic violence allegations between Balandran and his ex-partner as propensity evidence, but as contextual evidence to explain their "relationship dynamics" and BB's late disclosure of sexual abuse. RP at 215. The trial court indicated that the State would need to make an offer of proof at trial and reserved ruling on the issue.

Balandran also moved to exclude the State's proposed no corroboration jury instruction, which stated, "In order to convict a person of the crimes of Incest or Indecent Liberties as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated." CP at 47. The trial court reserved ruling on the issue.

## FIRST TRIAL

Witnesses testified consistently with the facts above.

At the first trial, BB testified that on the evening of November 22, 2020, Balandran was at her home to celebrate her birthday and had spent the night. The next morning, on November 23, BB heard her mother leave for work. Then, Balandran went to BB's room, took BB's pajama pants off, and asked if he could "play with [her genitals]." RP at 277-79. BB did not want Balandran to touch her and told him no. Balandran proceeded to touch "around [BB's] vagina" and penetrated her vagina with his fingers for around 30 minutes. RP at 281.

Balandran told BB sternly that she "was not allowed to tell [her mother]." RP at 281, 285-86. BB thought Balandran was going to be "very upset" with her if she told her mother about the incident. RP at 286. BB was also concerned that if she told her mother, then Balandran would hit or yell at BB .

BB testified that Balandran had touched her vagina before this incident but that it did not happen "all the time." RP at 288. Balandran did not object to this testimony. BB did not tell anyone about the prior incidents because she did not want to "get hit or get in trouble or have [her] parents fight." RP at 288.

BB further testified that during her parents' fight on their family trip, which prompted her to share the incident with her mother, Balandran strangled her mother. Balandran objected on relevance grounds, and the State responded that this evidence was relevant to show what led up to BB's disclosure to her mother. The trial court overruled Balandran's objection.

According to BB's mother, on the morning of November 23, Balandran arrived at her home between 6:30 and 7:00 a.m.[1] She testified that they got into a loud argument, and she then

---

[1] Balandran worked graveyard shifts from 10:00 p.m. to 6:30 a.m.

left for work at around 8:30 a.m. or 9:00 a.m. She believed she reported BB's sexual assault to the police on January 3, 2021.

Balandran introduced evidence that he worked from 9:58 p.m. on November 22 until 6:30 a.m. on November 23.

Consistent with his motion in limine, Balandran asked the trial court to exclude a jury instruction that said the State did not need to corroborate BB's testimony to convict him, or, alternatively, to issue a corroboration instruction with revised language. The court denied Balandran's request and issued the State's proposed instruction, noting that it more "closely mirror[ed] the instructions from the actual law and the case law." RP at 473.

The court also instructed the jurors that they were "the sole judges of the credibility of each witness" and "the value or weight to be given to the testimony of each witness." CP at 40. Also, each to-convict instruction included the following language: "If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty." CP at 50.

The trial court also issued a limiting instruction stating,

Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of allegations of domestic violence between the defendant and [Balandran's ex-partner]. This evidence may be considered by you only for the purpose of providing context and background to relevant facts. You may not consider it for the purpose of assessing the defendant's character or propensity. Any discussion of the evidence during your deliberations must be consistent with this limitation.

CP at 60.

The jury acquitted Balandran of indecent liberties, could not reach a unanimous decision on incest, and found him guilty of fourth degree assault (domestic violence) with sexual motivation.

SECOND TRIAL

The State retried Balandran on the incest charge at a second trial. Before the second trial, Balandran renewed his previous motions in limine and the trial court made no changes to its rulings on the motion in limine from the first trial. Witnesses testified consistently with the facts above. At the second trial, BB again recounted the incident between her and Balandran. She testified that she had a "rocky" relationship with Balandran. RP at 741. On the morning after her birthday, BB heard her parents argue. She testified that after her mother left the house, Balandran entered BB's room, took her pants off, and put his fingers inside her vagina. At some point, she told Balandran to stop. BB said that this incident happened around "7-ish maybe." RP at 749. She testified that when Balandran entered her room, she "knew what was going to happen" because "[i]t had happened before." RP at 753. BB further testified that, "[i]t happened, not all the time, but it would happen every once in a while." RP at 754. Balandran objected to BB's "entire statement" but did not state any grounds for his objection, which the trial court overruled. RP at 754.

BB's mother testified that as a dental assistant, she normally began work at 6:00 a.m. During her shifts, if there were no patients, she would leave work while on the clock to go home or do other errands. On November 23, she testified that she arrived at work around 6:00 a.m., picked up Balandran after he finished work around 7:00 or 8:00 a.m., took him to her home where they fought, and then went back to work.

The State presented evidence that BB's mother clocked into work on November 23 at 6:05 a.m. On cross-examination, she explained she had testified at the first trial that she "started work late on Mondays" because she "didn't want any backlash from [Balandran]," did not want "everybody knowing" that she would leave work on the clock, and did not want to get her employer "in trouble." RP at 876-77. She further testified that she did not report BB's sexual assault to the police until late January.

The court instructed the jury, "In order to convict a person of the crime of Incest as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated." CP at 123. Balandran objected to the no corroboration instruction. The court overruled the objection. The court also instructed the jurors that they were "the sole judges of the credibility of each witness" and "the value or weight to be given to the testimony of each witness." CP at 116. Also, the to-convict instruction included the following language: "If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty." CP at 125.

The jury found Balandran guilty of second degree incest. The trial court imposed the following community custody conditions, among others. Balandran may not have "contact with minors," "[m]ay not possess or use any electronic device capable of accessing the internet

without prior approval from the Community Corrections Officer [CCO],"[2] and must "[s]ubmit to urine and/or breathalyzer screening at the direction of the [CCO]."[3] CP at 159, 160.

ANALYSIS

## I. JURY INSTRUCTIONS

Balandran argues the no corroboration instructions inflated the value of BB's testimony, thereby diluting the State's burden of proof. Relatedly, Balandran contends the instructions singled out BB's testimony, misleading the jury into believing her testimony was subject to unique consideration. Balandran also argues that the trial court impermissibly commented on the evidence by issuing the no corroboration instructions. We disagree.

A. *Legal Principles*

The due process clause of the Fourteenth Amendment to the United States Constitution requires jury instructions to adequately convey to the jury that the State bears the burden of proving every element of the charged crime beyond a reasonable doubt. *State v. Imokawa*, 194 Wn.2d 391, 396-97, 450 P.3d 159 (2019).

We review a defendant's challenges to the jury instructions de novo, within the context of the instructions as a whole. *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). Jury instructions are constitutionally adequate when, taken as a whole, they state the law, are not

---

[2] The trial court imposed a condition that Balandran may not possess or access sexually explicit materials that are intended for sexual gratification. Balandran does not challenge this condition on appeal.

[3] The trial court imposed a condition that Balandran may not possess or consume alcohol, marijuana, or controlled substances. Balandran does not challenge this condition on appeal.

misleading, and allow the defendant to argue their theory of the case. *State v. Knapp*, 197 Wn.2d 579, 586, 486 P.3d 113 (2021).

B.  *The No Corroboration Jury Instructions Did Not Lessen the State's Burden of Proof or Mislead the Jury*

The no corroboration instructions given were based on RCW 9A.44.020(1), which states, "In order to convict a person of any crime defined in this chapter[,] it shall not be necessary that the testimony of the alleged victim be corroborated." For decades, courts have used jury instructions conveying this principle, known as "no corroboration jury instruction[s]." *State v. Rohleder*, 31 Wn. App. 2d 492, 502, 550 P.3d 1042 (2024), *review denied*, 3 Wn.3d 1029 (2024); *see State v. Clayton*, 32 Wn.2d 571, 573-74, 202 P.2d 922 (1949).

Courts have repeatedly upheld the no corroboration instruction as a correct statement of the law. *E.g.*, *Rohleder*, 31 Wn. App. 2d at 499-500; *State v. Chenoweth*, 188 Wn. App. 521, 537, 354 P.3d 13, *review denied*, 184 Wn.2d 1023 (2015); *State v. Johnson*, 152 Wn. App. 924, 936, 219 P.3d 958 (2009); *State v. Zimmerman*, 130 Wn. App. 170, 182, 121 P.3d 1216 (2005), *adhered to on remand*, 135 Wn. App. 970, 146 P.3d 1224 (2006).

In the first trial, the trial court instructed the jury, "In order to convict a person of the crimes of Incest or Indecent Liberties as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated." CP at 47. In the second trial, the court instructed the jury, "In order to convict a person of the crime of Incest as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated." CP at 123.

The court also instructed the jurors that they were "the sole judges of the credibility of each witness" and "the value or weight to be given to the testimony of each witness." CP at 40. Also, each to-convict instruction included the following language: "If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty." CP at 50.

Viewing the no corroboration instructions within the context of the instructions as a whole, the no corroboration instructions state the law accurately, are not misleading, and did not preclude Balandran from arguing his theory of the case. *Knapp*, 197 Wn.2d at 586. The instructions conveyed that BB's testimony did not need to be corroborated in order for the jury to convict Balandran of the charged crimes. This was an accurate statement of law. *See* RCW 9A.44.020(1). Furthermore, the instructions were not misleading because they did not attach any particular weight to BB's testimony and, viewing the instructions *as a whole*, they accurately informed jurors of their role as "judges of the credibility of each witness" and the State's burden to prove every element of the charged crimes beyond a reasonable doubt.

Thus, we hold that the no corroboration jury instructions were constitutionally adequate.

C.      *The No Corroboration Jury Instructions Were Not Comments on the Evidence*

Balandran argues that the trial court impermissibly commented on the evidence by issuing the no corroboration instructions. We are bound by the Supreme Court's opinion in *Clayton*, holding that a no corroboration instruction is not an improper comment on the evidence—even if worded slightly differently, as it is here—and therefore, we reject Balandran's argument.

Under Article IV, section 16 to the Washington Constitution, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." A trial court improperly comments on the evidence if it gives a jury instruction that conveys to the jury its personal attitude toward the merits of the case. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). "But because it is the trial court's duty to declare the law, a jury instruction that does no more than accurately state the law pertaining to an issue is proper." *Rohleder*, 31 Wn. App. 2d at 496.

We review alleged instructional errors de novo, within the context of the jury instructions as a whole, to determine if the trial court has improperly commented on the evidence. *Levy*, 156 Wn.2d at 721.

In *Clayton*, the defendant argued that the no corroboration instruction was an improper comment on the evidence. 32 Wn.2d at 573. The no corroboration instruction stated,

> You are instructed that it is the law of this State that a person charged with attempting to carnally know a female child under the age of eighteen years may be convicted upon the uncorroborated testimony of the prosecutrix alone. That is, the question is distinctly one for the jury, and if you believe from the evidence and are satisfied beyond a reasonable doubt as to the guilt of the defendant, you will return a verdict of guilty, notwithstanding that there be no direct corroboration of her testimony as to the commission of the act.

*Id.* at 572.

The Supreme Court disagreed, holding that the instruction was not an improper comment on the evidence because the instruction "expressed no opinion as to the truth or falsity of the testimony of the [victim], or as to the weight which the court attached to her testimony, but submitted all questions involving the credibility and weight of the evidence to the jury for its decision." *Clayton*, 32 Wn.2d at 573-74.

Furthermore, in *Rohleder*, a case involving multiple child sex abuse crimes, we recently addressed and rejected the argument that a no corroboration jury instruction is a comment on the evidence. 31 Wn. App. 2d at 494. Rohleder argued, like Balandran here, that the trial court erred by issuing the no corroboration instruction because it was a comment on the evidence. *Rohleder*, 31 Wn. App. 2d at 493-94. The defendant contended that we should not follow *Clayton* because the instruction did not include the same, additional clarifying language as that in *Clayton*. *Rohleder*, 31 Wn. App. 2d at 495-96; *see Clayton*, 32 Wn.2d at 572 (the instruction also stated, "[T]he question is distinctly one for the jury, and if you believe from the evidence and are satisfied beyond a reasonable doubt as to the guilt of the defendant, you will return a verdict of guilty" notwithstanding the absence of corroboration). We held that the differences in instructional language were irrelevant and applied *Clayton*, reasoning that *Clayton* remained binding precedent and that "[u]ntil the Supreme Court addresses this issue, we are constrained by *Clayton* to conclude that giving a no corroboration instruction is not a comment on the evidence." *Rohleder*, 31 Wn. App. 2d at 501.

Nevertheless, Balandran contends that *Clayton* is not controlling because the instructions suggested that the jury could believe only BB's uncorroborated testimony and not Balandran's testimony, and the instructions lacked the additional language found in *Clayton*. But the no corroboration instruction here is not significantly different from that in *Clayton* so as to take it beyond *Clayton's* reach. Balandran's underlying arguments were rejected in *Rohleder* based on

*Clayton*.[4]  *See Rohleder*, 31 Wn. App. 2d at 499, 500.  And based on *Clayton*, Balandran's

contention fails.

We agree with *Rohleder* that we are bound by the Supreme Court's decision in *Clayton*.

Because *Clayton* remains binding precedent, and the Supreme Court has not yet readdressed the

issue,[5] we hold that giving a no corroboration instruction is not a comment on the evidence.

*State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) (stating that "once [our Supreme Court]

has decided an issue of state law, that interpretation is binding on all lower courts until it is

overruled.").  Thus, the trial court did not err by issuing the no corroboration jury instructions in

both trials.

## II.  ER 404(b) EVIDENCE

Balandran contends that the trial court improperly admitted BB's testimony at the first

trial that Balandran strangled BB's mother and BB's testimony at the second trial that Balandran

sexually assaulting her on prior occasions because the court did not require the State to provide

an offer of proof and did not undergo ER 404(b)'s four-pronged test before admitting the

---

[4] The clarifying language in the *Clayton* instruction was included in the trial court's other jury instructions.  For example, instruction 1 read, "You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness."  CP at 40.  Also, each to-convict instruction included the following language: "If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty."  CP at 50.  Thus, Balandran's attempt to distinguish *Clayton* fails.

[5] The two most recent cases upholding the use of no corroboration instructions based on the court's holding in *Clayton* suggest that the "better practice" is to not give a no corroboration instruction.  *Rohleder*, 31 Wn. App. 2d at 501; *State v. Kovalenko*, 30 Wn. App. 2d 729, 746, 546 P.3d 514, *review denied*, 3 Wn.3d 1036 (2024).  But we are bound to comply with *Clayton* as long as it remains good law.  And the Supreme Court denied review in both *Rohleder* and *Kovalenko*.

evidence. We conclude that for the first trial, even assuming without deciding that the trial court erred in admitting the contested testimony, any alleged error was harmless, and for the second trial Balandran failed to preserve the error.

A.      *Legal Principles*

We review a trial court's decision to admit or exclude ER 404(b) evidence for an abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). A trial court abuses its discretion when its decision is unreasonable or based on untenable reasons or grounds. *State v. Arredondo*, 188 Wn.2d 244, 256, 394 P.3d 348 (2017).

Under ER 404(b), courts may not admit evidence of a defendant's other crimes, wrongs, or acts to prove their character and show they acted in conformity with said character. ER 404(b); *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). While ER 404(b) prohibits evidence of other misconduct to demonstrate a defendant's propensity to commit the crime charged, such evidence may be admissible, "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

Before a trial court admits ER 404(b) evidence, it must first "(1) find by a preponderance of the evidence the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value against the prejudicial effect of the evidence." *Fisher*, 165 Wn.2d at 745. The court must conduct this analysis on the record, and if it admits the evidence, it should give a limiting instruction. *Arredondo*, 188 Wn.2d at 257. In doubtful cases, the court should exclude the evidence. *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

When a court admits evidence in violation of ER 404(b), "we apply the nonconstitutional harmless error standard." *State v. Gunderson*, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014). In doing so, we determine whether there is a reasonable probability the outcome of the trial could have been materially affected had the error not occurred. *Id.* at 926. The error is harmless if the improperly admitted evidence is of little significance in light of the evidence as a whole. *State v. Fuller*, 169 Wn. App. 797, 831, 282 P.3d 126 (2012).

B. *Even if the Trial Court Erred in Admitting the Challenged Testimony at the First Trial, Any Alleged Error Was Harmless*

To convict Balandran of fourth degree assault (domestic violence) with sexual motivation at the first trial, the State had to prove beyond a reasonable doubt that Balandran assaulted BB, his family member, for the purpose of his sexual gratification. RCW 9A.36.041(1); RCW 10.99.020; RCW 9.94A.835.

Evidence at the first trial showed that BB was Balandran's daughter; that Balandran and BB had a tumultuous relationship; that Balandran went to BB's room, took her pajama pants off, and asked if he could "play with" her genitals; that BB did not want Balandran to touch her and told him no; that Balandran proceeded to touch "around [BB's] vagina" and penetrated her vagina with his fingers; and that Balandran had touched her vagina before this incident but that it did not happen "all the time." RP at 277-79.

BB's testimony that Balandran strangled her mother during a fight on a family trip, prompting BB to disclose the incident with her mother, is of minor significance in reference to the overall evidence as a whole. Based upon the evidence discussed above, the jury could have found that Balandran committed fourth degree assault (domestic violence) with sexual

motivation. This evidence, taken together, establishes that there is no reasonable probability that the outcome of the first trial would have been different absent the alleged evidentiary error. Furthermore, the trial court issued a limiting instruction for allegations of domestic violence between Balandran and BB's mother. And we presume the jury follows the court's instructions. *State v. Gamble*, 168 Wn.2d 161, 178, 225 P.3d 973 (2010). Thus, we hold that any evidentiary error was harmless.

C.      *For the Contested Evidence at the Second Trial, Balandran Waived His Objection by Failing to Properly Preserve His Objection*

The State contends that by failing to make a sufficient objection to BB's testimony at the second trial that Balandran previously sexually assaulted her, Balandran waived any evidentiary error regarding this testimony. We agree that Balandran's objection was insufficient to preserve this issue for appeal.

"[A]n objection must be sufficiently specific to inform the trial court and opposing counsel of the basis for the objection and to thereby give them an opportunity to correct the alleged error." *State v. Padilla*, 69 Wn. App. 295, 300, 846 P.2d 564 (1993). ER 103(a)(1) requires "a timely objection . . . stating the specific ground of objection, *if the specific ground was not apparent from the context*." (Emphasis added).

At the second trial, Balandran objected to BB's testimony that he had sexually assaulted her on prior occasions, but Balandran did not state the specific ground for his objection. The question becomes whether the specific ground for objection that Balandran now raises on appeal, ER 404(b), was "apparent from the context." It was not. Before the second trial, Balandran

renewed his previous motion in limine for the trial court to exclude "all evidence of prior bad acts," but he made no specific mention of instances of prior sexual assault. CP at 18.

Given this context, it is not apparent whether Balandran sufficiently informed the trial court and the State that ER 404(b) was the basis of his objection. In addition to Balandran not stating a basis for his objection, he did not ask to be heard on his objection, and did not make a further record on this matter at any time. Thus, Balandran's objection to BB's testimony at the second trial was insufficient to preserve the issue for appeal.

### III. COMMUNITY CUSTODY CONDITIONS

Balandran challenges three community custody conditions included in his judgment and sentence. He contends that the conditions restricting him from possessing or using devices that can connect to the Internet without prior approval and requiring him to submit to urine and/or breathalyzer screening should be stricken because they are not crime related. Balandran also argues that the condition restricting his contact with minors should be stricken because it "carves no exception for his minor children," thereby violating his fundamental right to parent. Br. of Appellant at 50.

A.   *Legal Principles*

Under RCW 9.94A.505(9), a trial court may impose "crime-related prohibitions" as part of a sentence. A crime-related prohibition disallows "conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10).

We review de novo whether the trial court had authority to impose a sentencing condition. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). But we review a challenge that a community custody condition is not crime related for an abuse of discretion.

*State v. Sanchez Valencia*, 169 Wn.2d 782, 792, 239 P.3d 1059 (2010). The trial court abuses its discretion when it imposes an unconstitutional sentencing condition. *State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008). The court also abuses its discretion when it imposes a condition that lacks a reasonable relationship to the crime. *State v. Nguyen*, 191 Wn.2d 671, 678, 425 P.3d 847 (2018).

B.      *Balandran's Challenges to Community Custody Conditions*

Balandran challenges three community custody conditions in his judgment and sentence.

The first challenged condition states that Balandran "[m]ay not possess or use any electronic device capable of accessing the internet without prior approval from the [CCO]." CP at 159. Balandran argues that this condition is not crime related. The State responds that the condition is crime related but concedes that it should be amended to conform with existing case law. We accept the State's concession.

The State cites to *Nguyen* in support of its argument that prohibitions meant to prevent access to sexually explicit materials are crime related in sex cases. In *Nguyen*, the Supreme Court held that the condition prohibiting Nguyen from possessing or viewing "'sexually explicit materials'" was reasonably related to his crimes of child rape and molestation because "Nguyen committed sex crimes and, in doing so, established his inability to control his sexual urges." *Id.* at 686. While *Nguyen* provided that sentencing courts may use "their discretion to impose prohibitions that address the cause of the present crime or some factor of the crime that might cause the convicted person to reoffend," it maintained that there must be a sufficient connection between the prohibition and the convicted crime. *Id.* at 684-86.

Unlike in *Nguyen*, here, the Internet condition does not focus on sexually explicit materials but rather, wholly restricts Balandran's Internet access regardless of subject matter. The State does not point to any evidence in the record connecting the Internet to any of Balandran's crimes.

We have struck community custody conditions restricting Internet access where there is no connection between Internet usage and the convicted crime. *See State v. O'Cain*, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008). In *O'Cain*, Division One struck a condition that required the defendant to get prior approval from his CCO to use the Internet because it was not crime related. *Id.* at 774. There, the court reasoned that "[t]here is no evidence that [the defendant] accessed the Internet before the rape or that Internet use contributed in any way to the crime." 144 Wn. App. at 775. Similarly, here, there is no evidence in the record to suggest that the Internet contributed in any way to Balandran's offenses.

Balandran alternatively argues that we should strike this condition because it is overly broad, thereby impermissibly infringing on his right to free speech. We agree.

The Washington Supreme Court recently approved a community custody condition that the offender shall "not use or access the World Wide Web unless specifically authorized by [his community custody officer] through approved filters." *State v. Johnson*, 197 Wn.2d 740, 744, 487 P.3d 893 (2021) (alteration in original) (internal quotation marks omitted). In *Johnson*, the court concluded that "any danger of arbitrary enforcement is constrained by other documents related to" Johnson's convictions. *Id.* at 749. According to the court,

> Johnson committed his crimes using the Internet. A proper filter restricting his ability to use the Internet to solicit children or commercial sexual activity will reduce the chance he will recidivate and will also protect the public. While a blanket ban might well reduce his ability to improve himself, a properly chosen

> filter should not. We encourage Johnson's future community custody officer to have a meaningful conversation with Johnson about appropriate Internet use and to choose filters that will accommodate Johnson's legitimate needs.

*Id.* at 745-46.

Here, the Internet condition is not narrowly tailored like that in *Johnson*. Indeed, "unlike in *Johnson*, the State's supervision of [Balandran's] Internet use is not tempered by the use of a filter. Instead, [Balandran's] every action on a computer or the Internet must be preapproved. This is unnecessarily broad." *State v. Geyer*, 19 Wn. App. 2d 321, 330, 496 P.3d 322 (2021). Accordingly, we reverse this condition and remand for the trial court to strike or modify the condition.

The next challenged condition states that Balandran must "[s]ubmit to urine and/or breathalyzer screening at the direction of the [CCO]." CP at 160. Balandran argues that this condition is not crime related. Here, the trial court had the authority to impose conditions that prohibited Balandran from using alcohol or drugs. *See* RCW 9.94A.703(2)(c), (3)(e); *see State v. Kinzle*, 181 Wn. App. 774, 786, 326 P.3d 870 (2014). Once the court imposed these conditions, as it did here and which Balandran does not challenge, the trial court also had authority to impose random compliance testing regardless of whether alcohol or drugs played a role in the underlying crimes. *State v. Greatreaks*, __ Wn. App. __, 893, 566 P.3d 886 (2025) ("The challenged condition [requiring Greatreaks to submit to random urinalysis and breathalyzer testing] does not need to be crime related"); *see State v. Nelson*, __ Wn.2d __, 917-18, 565 P.3d 906 (2025) (rejecting Nelson's argument that because his underlying offenses have no direct tie to drug or alcohol use, random urine and breathalyzer testing is constitutionally

prohibited, holding that these community custody conditions, "regardless of their crime-relatedness," do not make them unconstitutional). Accordingly, we affirm this condition.

Lastly, Balandran challenges the condition that he may not have "contact with minors." CP at 159. Balandran argues that this condition violates his fundamental right to parent because it "carves no exception for his [other] minor children." Br. of Appellant at 50. Balandran further argues that we should remand to the trial court to conduct the required analysis on the record. We agree that remand is appropriate.

We review conditions implicating the constitutional right to parent for an abuse of discretion. *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 374-75, 229 P.3d 686 (2010). When a condition interferes with the right to parent, the condition must be sensitively imposed and reasonably necessary to accomplish the essential needs of the State and public order. *Id.* at 377.

"A parent has a fundamental constitutional right to the care, custody, and companionship of their children." *State v. DeLeon*, 11 Wn. App. 2d 837, 841, 456 P.3d 405 (2020). The State may interfere with this right only if doing so is "reasonably necessary to prevent harm to a child." *Id.* "Such conditions 'must be narrowly drawn' and '[t]here must be no reasonable alternative way to achieve the State's interest.'" *Id.* (alteration in original) (internal quotation marks omitted) (quoting *State v. Warren*, 165 Wn.2d 17, 34-35, 195 P.3d 940 (2008)).

Before the trial court prohibits a defendant from ever contacting their children, it must address on the record (1) the defendant's constitutional right to parent, (2) explain why the condition prohibiting contact is reasonably necessary to achieve the State's interest in protecting the defendant's children, and (3) analyze whether less restrictive alternatives exist. *Id.* at 841-42; *State v. Martinez Platero*, 17 Wn. App. 2d 716, 725, 487 P.3d 910 (2021) (remanding to trial

court for failure to "analyze whether [the defendant] should be prohibited from contacting his . . . daughter before" prohibiting him from contacting minors without supervision).

Here, the trial court did not conduct the required analysis on the record. Thus, the trial court abused its discretion. Accordingly, we reverse the condition prohibiting Balandran's contact with all minors and remand to the trial court with instructions to address, on the record, whether to impose the condition, taking into consideration Balandran's constitutional right to parent his other minor children, the necessity of a provision prohibiting contact with all minors, and any viable, less restrictive alternatives that may exist.

CONCLUSION

We hold that the no corroboration jury instructions were constitutionally adequate; that the no corroboration instructions were not a comment on the evidence; that any alleged error in admitting the challenged testimony at the first trial was harmless; and that Balandran's objection to BB's testimony at the second trial was insufficient to preserve the issue for appeal. In addition, we hold that the trial court abused its discretion by imposing community custody conditions prohibiting Balandran from contact with all minors and possessing or using any electronic device capable of accessing the Internet without prior approval, but that the trial court lawfully imposed CCO-directed urinalysis and breathalyzer testing.

Accordingly, we reverse the condition prohibiting Balandran from possessing or using any electronic device capable of accessing the Internet without prior approval and remand for the trial court to strike or modify this condition. We also reverse the condition prohibiting Balandran's contact with all minors and remand to the trial court with instructions to address, on the record, whether to impose the condition, taking into consideration Balandran's constitutional

23

No. 59027-1-II

right to parent, the necessity of a provision prohibiting contact with all minors, and any viable, less restrictive alternatives that may exist. We affirm the condition requiring CCO-directed urinalysis and breathalyzer testing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Maxa, P.J.

Price, J.